**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SOUTH BAY DAILY BREEZE, Respondent.**

No. 21949.

United States Court of Appeals Ninth Circuit.

Aug. 1, 1969.

Rehearing Denied Sept. 19, 1969.

Lawrence Joseph (argued), Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Lawrence M. Joseph, J. Richard Thesing, Attys., Washington, D. C., for petitioner.

O'Melveny & Myers (argued), Charles G. Bakaly, Jr., Peter M. Anderson, Stanley H. Williams, Brundage & Hackler, Los Angeles, Cal., for respondent.

Before BARNES and CARTER, Circuit Judges, and BYRNE,* Senior District Judge.

BARNES, Circuit Judge:

This case is before us pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1964), which authorizes our review of orders issued by the National Labor Relations Board. The Board has petitioned for enforcement against the respondent, South Bay Daily Breeze, of an order issued on October 12, 1966, and reported (along with the Board's decision) at 160 N.L.R.B. 1850 (1966).

Respondent publishes a daily newspaper in Torrance, California. In April, 1965, an international representative of the American Newspaper Guild met with three employees of respondent and discussed with them the advantages of Guild representation. An organizing campaign followed. Fifteen signed authorization cards were soon obtained, and the international representative sent a telegram to respondent, requesting recognition as the bargaining agent of respondent's editorial employees. Estimates regarding the size of the appropriate bargaining unit at that time ranged from twenty-two to twenty-eight employees, and respondent's publisher, Robert Curry, expressing doubt that the Guild represented a majority of the em-

---

* Hon. William M. Byrne, Senior United States District Judge, Los Angeles, California, sitting by designation.

ployees in the unit, refused to grant such recognition. A National Labor Relations Board election was subsequently scheduled for July 20, 1965.

In the interim, several incidents relevant to this litigation occurred. First, in a representation hearing before the Board's Regional Director, the appropriate unit was fixed at twenty-five employees. Respondent waived its right to seek Board review of that determination. Second, certain of respondent's supervisors questioned various employees concerning their pro or anti-union sympathies, at times suggesting with some specificity that pay increases would follow the election. Statements were made by supervisors to the effect that there were "ways" of ascertaining who supported the union, and that if the union were approved, work rules would be manipulated so that such persons could be discharged.[1] In addition, the possibility of a blacklist of union sympathizers was suggested.

After the election, which resulted in a tie vote,[2] the Guild filed with the Board timely objections to respondent's conduct. The Board set aside the election and found that respondent had violated the Act (1) by interfering with its employees' rights under section 7 to choose their bargaining agent freely and without coercion, and (2) refusing to bargain with the Guild. The resulting order prohibited respondent from continuing to engage in the unfair labor practices found to have been committed and from interfering in any other manner with its employees' rights under the Act. Affirmatively, respondent was ordered to bargain with the Guild upon request.

# I

## EMPLOYERS' INTERFERENCE

Respondent's challenge to the finding that it interfered with its employees' free choice of a bargaining agent during the pre-election period is limited to the argument that a document relating to its conduct was improperly considered by the Board. Indeed, that argument would seem to constitute the only possible attack on the findings referred to, since there clearly exists substantial support for the conclusions that respondent's supervisors interrogated employees, gave the impression of surveillance regarding their union activities, promised post-election benefits, and threatened that various unpleasant consequences might befall union supporters.

The document in question is a memorandum prepared for publisher Curry by News Editor Kenneth Johnson. It provided the trial examiner and the Board with highly persuasive evidence that respondent was during the pre-election period attempting to interfere with the free choice of its employees.[3] The basis

---

1. The following testimony, for example, was given by employee Patricia McDonnell with respect to a conversation between her and News Editor, Kenneth Johnson, concerning the possible consequences of a union victory:

   "He said things would be tougher, and I said, 'How could it be, if [the employees] would be protected for six months after an election?'

   "And he said, 'Well, so the Guild get in. Then know how Lori [Geittmann, an employee,] is late all the time. We just change her hours, and I will have her come in at 5:00 in the morning, and you know how long it would take before Lori is being late.'

   "And he said, 'We could dismiss her after a week.'

   "When it came to Bob Jones, he said, 'You know what an old maid he is about his routines and his schedules; all we have to do is put him on a split shift, and he couldn't take that very long.'" Record, vol. 9, at 475.

2. The vote was 13–13, one newly hired employee apparently having been added to the unit prior to the election.

3. Regarding one employee, for example, the memorandum reported,

   "Sees dollar signs, thinks he's better and worth more than he is. Is very impressionable. Listens to me a lot, and a last minute promise of more money from me would weigh heavily on his decision * * * He is the kind you worry about selling the day of the election." Record, vol. 1, at 71.

for respondent's challenge to the admissibility of the memorandum lies in the fact that it was taken from Johnson's desk *without permission* by employee Gary Gillis.

█ We may assume that if admission of the memorandum into evidence was improper, its prejudicial effect is sufficient to preclude enforcement of the Board's order (at least insofar as that order relates to the findings of interference with the section 7 rights of respondent's employees); its probative force is such that it very likely played at least some relatively significant part in the trial examiner's resolution of the questions before him. Nevertheless, we are unable to hold in favor of respondent, for we do *not* view admission of the memorandum as error.

Respondent contends that the document should have been excluded on the ground that it was obtained in violation of the Fourth Amendment. In rejecting this contention, we are controlled both by the Supreme Court's only holding squarely on point and that Court's description of the judicial protection afforded by the amendment. In our judgment, neither prerequisite for invocation of the Fourth Amendment (proscribed conduct by a government official and prosecution of a criminal nature) is here present.

In Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048, (1921), the Court ruled that the use in a criminal prosecution of personal papers stolen from the accused by a private individual did not violate the accused's Fourth Amendment rights when the government was in no way involved in the theft. Although challenged in cases decided after the Court's holding in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), outlawed federal use of evidence illegally obtained by

state agents (*e. g.*, United States v. McGuire, 381 F.2d 306, 313–314, n. 5 (2d Cir. 1967), *cert. denied*, Perry v. United States, 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 848 (1968)), the *Burdeau* holding has not been overruled. A recent decision by the Seventh Circuit, Knoll Associates, Inc. v. F. T. C., 397 F.2d 530 (7th Cir. 1968), is not inconsistent with our reading of Burdeau. While there holding that evidence illegally seized by an employee should not have been admitted because of Fourth Amendment violations, the court stated that, "[t]he undisputed evidence shows that [the disloyal employee] stole the documents for the purpose of assisting the Commission counsel in the prosecution of the proceeding then pending, and the record shows that the Commission by its use of the documents knowingly gave its approval to [the employee's] act." *Id.* at 533. This is conduct not countenanced by *Burdeau*, where the Court made pointed reference to the fact that government action was not present in the taking.[4] 256 U.S. at 476, 41 S.Ct. 574, 65 L.Ed. 1048.

In *Knoll, supra,* the actions of the government and the thief were so related as to make the thief a government agent and his conduct unacceptable under long standing Fourth Amendment grounds. Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927). The present case is significantly different. There is no showing here that the purpose for which the memorandum was taken was to aid the Board in its case against respondent; Gillis' testimony, in fact, was to the contrary. 6 R.T. at 99. The document was taken prior to the election and some time before these proceedings were initiated. In such circumstances, at least, the mere evidentiary use by the General Counsel of the memorandum does not constitute pro-

---

4. This distinction was recognized by the *Knoll's* court, *supra*, which stated at 536 n. 5, "In contrast [to *Burdeau*] in the case at bar * * * the disloyal employee, furnished to Bernard Turiel [the government agent] by telephone informa-

tion which established the connection between the Commission and Knoll, resulting in Prosser's [the employee] testifying as a Commission witness against Knoll. The facts in this case are the antithesis [*sic*] of those in *Burdeau*."

hibited conduct. *Compare:* Barnes v. United States, 373 F.2d 517 (5th Cir. 1967) *with* Corngold v. United States, 367 F.2d 1 (9th Cir. 1966).

■ Even if we did not reject respondent's contention as incompatible with the *Burdeau* mandate, we would decline to invoke constitutional protection because the Board's proceeding was not one subject to the standard of the Fourth Amendment. Traditionally, that amendment has only applied where "criminal" or "quasi-criminal" sanctions might be imposed. Camara v. Municipal Court, 387 U.S. 523, 18 L.Ed.2d 930 (1967); One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885). The object of those proceedings "is to penalize for the commission of an offense against the law." 380 U.S. at 700, 85 S.Ct. at 1250. This is not the case here, since neither criminal procedures nor sanctions are involved. *See* In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). The exclusionary rule is not here appropriate. *Contra,* Knoll Associates, *supra;* NLRB v. Bell Oil & Gas Co., 98 F.2d 870 (5th Cir. 1938).

Even if we disregard the procedural context and its consequences, and focus on the applicability of the Fourth Amendment in terms of the intended "security to be afforded" the individual (the approach advocated by the Knoll's court, 397 F.2d at 535), we find, because of our initial determination, involving *Burdeau,* that the exclusionary rule is inapposite. The function of the rule is "to compel respect for the constitutional guarantee [of the Fourth Amendment] in the only effective available way—by removing the incentive to disregard it." Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1959). There is no logic in excluding evidence to prevent the government from violating an individual's constitutional rights in a case when the government is not guilty of such a violation.

Respondent further argues that even if admission of the memorandum is not constitutionally forbidden, the use of such evidence is inconsistent with the National Labor Relations Act. The argument stresses the aim of the Act to foster "industrial peace"—an objective unlikely to be achieved, respondent insists, if labor and management are free to pilfer documents from each other in the hope of turning up evidence of unfair labor practices. But, of course, the Act is designed to achieve industrial peace only through application of the provisions contained therein—not to provide a broad authorization for any and all reforms which particular courts might deem helpful toward that end. Nor are employers or employees "free" to steal documents; civil and criminal remedies are readily available to deal with such conduct, and we have been provided with no persuasive evidence that those remedies are or will be ineffective.

Respondent cites Hoosier-Cardinal Corp., 67 N.L.R.B. 49 (1946), suggesting that that decision represents a Board determination that evidence obtained illegally should not be admitted in unfair labor practice proceedings. In *Hoosier-Cardinal, supra,* a union had refused to allow the Board to examine certain of its papers. Later an individual who was secretly working for a rival labor organization managed to be elected secretary-treasurer of the union and allowed a Board agent (accompanied by a representative of the rival organization) to examine and make photostatic copies of the papers in question. The Board held the copies inadmissible, explaining that

"[i]t is better that there be a failure to take full advantage of such dubious opportunities than that Government, which 'teaches the whole people by its example, * * * should play an ignoble part.' As an administrative agency having both investigating and judicial duties, this Board must exact the highest standards of conduct from its investigating officers." 67 N.L. R.B. at 55 (footnote omitted).

It is not at all clear that *Hoosier-Cardinal, supra,* must necessarily be viewed as inconsistent with the Board's decision here. The Board agent in that case was aware of the official policy of the union in question and was directly and knowingly involved in the covert and apparently unauthorized copying of the documents sought. Regardless, however, of whether it is thought that such circumstances allow a satisfactory line to be drawn between the two cases, we conclude that the rule invoked here by the Board is correct: where the Board merely accepts and makes use of evidence illegally obtained by private individuals, exclusion of such evidence is not required by the Act.

## II

### REQUIREMENT TO BARGAIN

Respondent secondly challenges that part of the Board's order which requires it to bargain with the Guild. Its attack consists primarily of the contention that the Guild never represented a majority of its editorial employees. Fifteen of the twenty-five employees in the bargaining unit (as that unit was to be determined by the Regional Director) signed cards in April, 1965, authorizing the Guild to represent them, and it is on this foundation that the Board's bargaining order rests. Respondent argues, *inter alia,* that certain of the employees who signed cards did so on the basis of union misrepresentation concerning their effect, and that those employees intended merely to indicate their support for a Board election. A review of the record lends some support for this contention.

Authorization cards are a notoriously inaccurate method for determining employees' sentiment regarding a bargaining agent; it has been widely recognized that a secret Board election is by far the better method. The Board conceded that in certain circumstances where misrepresentation has occurred a signed card ought not to be taken as reflecting endorsement of the union in question as the signer's bargaining agent; however, it applied a standard under which a card's statement of authorization must be accepted unless union representatives assured the signer—explicitly, it would seem—that the card would be used "only for an election." Record, vol. 1, at 82. On the basis of this "only" rule, the Board itself rejected one of the signatures, leaving fourteen, a majority, standing.[5]

This policy is consistent with the practice recently outlined by the Supreme Court in NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 17, 1969). There the Court resolved a conflict between the First and Fourth Circuits regarding the correctness of a bargaining order based on a card-evidenced majority where the employer has committed unfair labor practices tending to foreclose the holding of a fair election. The Court first ruled that a Board election is not the only method open to a union to establish a bargaining obligation, stating at 89 S.Ct. 1934 that

"[t]he acknowledged superiority of the election process * * * does not mean that cards are thereby rendered totally invalid, for where an employer engages in conduct disruptive of the election process, cards may be the most effective—perhaps the only—way of assuring employee choice."

---

5. The Board's approach, ratified by the Supreme Court in N.L.R.B. v. Gissel Packing Co., Inc., 37 U.S.L.W. 4536 (June 17, 1969), *infra,* has been criticized by the First and Fourth Circuits. *See* N.L.R.B. v. S. S. Logan Packing Co., 386 F.2d 562, 565–566 (4th Cir. 1967); N.L.R.B. v. S. E. Nichols Co., 380 F.2d 438, 442–443 (2d Cir. 1967). We are aware of countervailing equities. Both the employer and the employee retain remedies if bargaining is required on the basis of card certification. Employees can petition for decertification if they are unhappy. 29 U.S.C. § 159(c) (1) (A) (ii). The employer, if convinced there is no majority favoring a union, can petition the Board for an election. 29 U.S.C. § 159 (c) (1) (B).

The Court then considered the effect of potential employee confusion generated by a single-purpose card, which states plainly that the signer designates the union his representative, which is presented by a union recruiter who promises that the card will be used in part "to get an election." The Court held that

"employees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election." *Id.* at 1936.

With this teaching of the Court before us, we turn to an evaluation of challenges made to the validity of proffered cards, being mindful of the Court's admonition that

"[w]e * * * reject any rule that requires a probe of an employee's subjective motivations as involving an endless and unreliable inquiry." *Id.* at 1937.

There is considerable support for the conclusion that Erickson's card should have been rejected even under the test apparently applied by the Board. The trial examiner and the Board made the following findings with respect to Erickson:

"Gillis solicited Erickson's card and told him about the Guild, the possibility of having it represent the employees in collective bargaining with Respondent and the possible benefits they could receive by joining the Guild. He told Erickson that the cards would bring about an election whereby all the employees could vote by secret ballot and determine through the election whether or not they wanted to be represented by the Guild and that he did not want Erickson to commit himself one way or the other at that time regarding his vote. Gillis stated that

he wanted to get as many cards signed as he could and that this would show the Company that the employees were united and that they wanted better conditions; and the more cards, the better. He stated that the cards would all be kept secret, but that the total number would be sent by telegram to the Respondent." Record, vol. 1, at 81.

Erickson was not told that his card would be used for any purpose other than for securing an election, and in response to the question whether he was told that the card was *only* for an election, he stated, "Yes, he [Gillis] told me that in so many words." Record, vol. II, at 676. He also testified,

"I was undecided at that time whether it was good or bad to have the Guild represent the employees, and I didn't know at that time how I wanted to vote. The whole thing was very new to me. I remember in the back of my mind that I certainly didn't want to commit myself at that time one way or the other for a vote. And when he assured me that the card was to call an election, why, I understood then that I could decide later which way I wanted to vote." *Id.* at 677.

The foregoing testimony demonstrates, we believe, that Erickson's cards should not have been accepted as establishing that he desired to be represented by the Guild.

We cannot come to the same conclusion with respect to Gray. The Board adopted the following findings of fact regarding Gray:

"Gray's authorization card was solicited by Gillis. Gray had been a member of the Guild when employed by another newspaper. Gillis told him that he was trying to get signatures together to bring about an election for representation by the Guild, and that he thought all of the employees at Respondent would be better off with union representation, and he urged Gray to sign a card." Record, vol. 1, at 81.

Gray's case presents a much closer question than Erickson's and we think that the above findings, viewed in light of the evidence supporting them, are consistent with the conclusion that Gray's card reliably indicated a desire for Guild representation. It is true, Gray stated that his sole intent in signing was to aid in bringing about an election. Record, vol. 12, at 747. The Board answers that Gray "read the card and knew that it could be used to obtain representation without an election." Brief for Petitioner at 36. The testimony on which the Board apparently relies in making this contention, is as follows:

"Q. Didn't he say that if things went as well as they had been going, they would be sitting down at the bargaining table with Mr. Curry?

"A. I believe he showed some optimism, as far as he was concerned in bringing about an election.

"Q. You knew, didn't you, that Mr. Curry could capitulate and could just recognize the union without an election, didn't you know that?

"A. I believe I was aware of that." Record, vol. 12, at 742–43.

Thus, while a close question is presented on Gray's case, we cannot second guess the Board's conclusion that Gray's card can be accepted to establish his support for the Guild. This leaves a majority of thirteen cards, and is sufficient basis, therefore, for that part of the Board's order which compels respondent to bargain with the Guild.[6]

We recognize that the passage of time brought about by respondent's conduct may have cooled the organizational ardor that existed in 1965 or, indeed, may have seen the occurrence of substantial changes in the composition of the bargaining unit; but these difficulties are in some measure, the sort that inhere in any orderly system of adjudication, and are in any event not determinative.[7] Employee self-determination is, after all, the basic objective of the Act.

The Board's order will be enforced in both its aspects.

BYRNE, Senior District Judge (dissenting in part):

I agree with the majority that that part of the Board's decision finding unfair labor practices by reason of interference with the election should be affirmed. However, that part ordering respondent to bargain should be reversed and a new election ordered.

The union obtained fifteen signed authorization cards over the weekend of April 23–25, 1965. At the hearing before the trial examiner, the respondent questioned seven of those cards. The trial examiner determined that fourteen of the cards were valid. Using this number and the size of the unit, the trial examiner concluded that the union had a majority on April 26, 1965, and thus that the respondent could be ordered to bargain with the union. On review the respondent questions the determination of the trial examiner made with regard to five of the employees.

The trial examiner apparently followed the "only" rule established in the Sixth Circuit. NLRB v. Cumberland Shoe Corp., 351 F.2d 917. Under that rule it was held that an authorization card is valid to show representation unless the employer can show that solicitors represented to the employee that the "sole" or "only" purpose in signing the card was to obtain an election. A very mechanical interpretation of this rule was made which required that the actual

---

6. There is some force to the board's contention that since respondent interfered with the free choice of its employees in the election, its challenges to reliance on authorization cards ill becomes it. However, the respondent has properly been found to have violated the Act in interfering with the election campaign and has been specifically prohibited from continuing such conduct.

7. *See* Gissel, *supra*, 395 U.S. 575, 89 S. Ct. 1918, 23 L.Ed.2d 547.

words "sole" or "only" be used and so the court modified its rule. In the case of NLRB v. Swan Super Cleaners, Inc., 384 F.2d 609 (6th Cir. 1967), the court explained that no special words were necessary and that any card was invalid where representation had been made which conveyed the thought that the sole and only purpose of the card had been to obtain an election. The Board generally has followed those decisions in what has been recognized as the Board's *Cumberland* rule.

Subsequent to the Board's decision in the instant case, the Supreme Court decided NLRB v. Gissel Packing Co. Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 17, 1969). In *Gissel* the court held, "In resolving the conflict among the circuits in favor of approving the Board's *Cumberland* rule, we think it sufficient to point out that employees should be bound by the clear language of what they sign unless that language is deliberately and clearly cancelled by a union adherent *with words calculated to direct the signer to disregard and forget the language above his signature.*" (emphasis supplied). The Court further admonished, "We agree, however, with the Board's own warnings in Levi Strauss, 172 N.L.R.B. No. 57, 68 L.R. R.M. 1338, 1341, and n. 7 (1968), that in hearing testimony concerning a card challenge, trial examiners should not neglect their obligation to ensure employees free choice by a too easy mechanical application of the *Cumberland* Rule."

The problem here is whether there has been "a too easy mechanical application of the *Cumberland* Rule." The trial examiner himself recognizing "words calculated to direct the signer to disregard and forget the language above his signature" rejected the card of Marx Ceder. He found that a union adherent had told Ceder that the card was to bring about an election and that the authorization language on the card meant nothing. Strangely, although he made similar findings with respect to other employees, he did not reject the cards of such employees.

The majority of this court adhering to the teaching of *Gissel*, follows the *Cumberland* doctrine and properly holds that the card of employee Erickson should not have been accepted as establishing that he desired to be represented by the Guild.

Applying the same test as the Board applied in the case of Ceder and the majority of this court applied in Erickson, the cards of several other employees, particularly Cole and Gray, should also be invalidated.

Of paramount importance in determining the credibility of Cole and Gray, but apparently given little thought by the trial examiner, the Board, or the majority of this court, is the fact that the entire record clearly shows, and is not disputed, that the *original purpose in obtaining signatures on the cards was to bring about an election.*

The trial examiner found that even Rinehart, who was one of the two men assigned to solicit the cards from the other employees, when he questioned the language of the cards, was told by the Guild representative that the "cards indicate the employees are interested in the Guild and that they want an election", and when Rinehart was asked, "Did Mr. Schrader say at this meeting that one of the purposes of signing the card was to have the Guild as a bargaining representative without an election?", he replied, "I don't recall that, no." And so one of the solicitors was a man who, himself, believed that the only purpose of the cards was to obtain an election. The other solicitor was Gillis, who incidentally was the employee referred to in Part I of the majority opinion, who pilfered the document from the Editor's desk.

After reading the majority's discussion of Gray's situation, it is difficult to understand how it concluded that

Erickson's card should be rejected but Gray's accepted. Both were solicited by Gillis and the misrepresentations were almost identical. Both were told the purpose of the cards was to obtain an election—both testified as to their reliance on the misrepresentations and that their sole purpose in signing the card was to bring about an election.

It is interesting to note that the solicitation of Marx Ceder by Gillis follows the same pattern and is almost identical with that of Erickson, Cole and Gray. The trial examiner, while holding the misrepresentations made to Erickson and Gray did not warrant the rejection of their cards, concluded, "Ceder was asked to sign 'at least for an election' and 'simply to bring about an election'. Ceder was thereby induced to sign the card and I conclude and find that his card should not be counted." It should further be noted that the word "only" was not used during the solicitation of Ceder, Erickson, Gray or Cole. In short, the trial examiner did not apply "a too easy mechanical application of the *Cumberland* rule" to Ceder, but for some strange reason he did to Erickson, Gray and Cole.

With respect to Cole, the trial examiner found that Gillis specifically told him that he could disregard the authorization language as the sole purpose was to have an election. However, the examiner concluded that, because Cole testified that he was impressed by the solicitation, he probably would have signed anyway. This is not only irrelevant, since he in fact signed in response to the representation, but it is also unsupported by the evidence since there is no indication of what he *might* have done in the absence of the misrepresentations which the trial examiner himself said warranted rejection of his card. (R. 83).

I would reverse that part of the Board's decision ordering respondent to bargain and remand with directions to order a new election.