**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert HARPER, Defendant-Appellant.**
**No. 18846.**

United States Court of Appeals,
Seventh Circuit.

Nov. 10, 1971.

Rehearing Denied Feb. 14, 1972.

Certiorari Denied May 15, 1972.
See 92 S.Ct. 1772.

Charles Bellows, Chicago, Ill., for defendant-appellant.

William C. Lee, U. S. Atty., Fort Wayne, Ind., Michael G. Kelly, Sidney M. Glazer, Attys., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before DUFFY, Senior Circuit Judge, and KILEY and KERNER, Circuit Judges.

KERNER, Circuit Judge.

Appellant, Robert Harper, and a co-defendant, Thomas Upshaw, were indicted on eleven counts charging that they knowingly subscribed false Internal Revenue Service Form 730s in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2. In a trial without a jury, Harper was convicted on each of the eleven counts and Upshaw was acquitted. Harper now appeals his conviction.

The false Form 730s, or wagering tax forms as they are more commonly known, were filed monthly by a "policy" or "numbers" operation known as Tri-State Enterprises. Tri-State, during the eleven months covered by the indictment, was managed by the defendant.

The government's proof consisted of testimony by two witnesses and certain business records taken from Tri-State by Mattie Turnipseed, a former Tri-State employee. Mrs. Turnipseed testified that it was Tri-State's practice to conduct three daily drawings to determine winning numbers, and that she, as bookkeeper, kept a detailed record of the operation's transactions. The bookkeeping system was not complicated. A clerk kept a duplicate running record showing the money brought in for bets, the "hits" by bettors and the initials of the "pick-up men" who solicited the bets. That record was totaled after each drawing and a copy given to both Mattie Turnipseed and the defendant. Mrs. Turnipseed would use this record to compile the daily and weekly wagering totals. These figures were also given to the defendant and would serve as the basis upon which he computed the weekly payroll for the "pick-up men."

The questioned wagering tax returns were prepared monthly by an accounting firm which the defendant had retained. An accountant from the firm testified that the information used in making the returns was supplied each month by Tri-State Enterprises. He was unable to say by whom the information was delivered. We note, additionally, that it is unclear from the record whether the forms were prepared by the firm prior to the defendant's signing them or whether he pre-signed them. It is, however, undisputed that Harper signed the forms and the accompanying checks.

The records, which are the basis for the defendant's primary attack upon his conviction, were introduced at trial to show the difference between the actual gross wagering receipts and the amount reported. It appears that Mattie Turnipseed retained her copies of gross receipt records and took them with her when she left the employ of Tri-State. Eight months after leaving, she was contacted by two special agents from the Internal Revenue Service and her cooperation was requested in connection with their investigation of Tri-State Enterprises. While the agents were unaware of the existence of the records when they initially contacted her, upon discovery that she had records which would be useful in their investigation, they agreed that in exchange for the records, she would be granted immunity from any prosecution for her prior connection with Tri-State.

In seeking reversal of the conviction, the defendant argues that his right to privacy, as guaranteed by the Fourth Amendment, was violated by the government's procurement of the records. Pre-trial suppression of the records was refused by the district court and they were admitted to show a discrepancy of $1,982,261.77 in Tri-State's actual gross

wagering receipts and the amount reported.[1] The defendant now urges that this information, serving as it does as the basis for his conviction, should have been excluded as the fruit of an unlawful search. We do not agree.

In Burdeau v. McDowell, 256 U.S. 465, 467, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), the Supreme Court held that "the Fourth Amendment protects only against searches and seizures which are made under governmental authority, real or assumed, or under color of such authority" and that the exclusionary machinery of the Fourth Amendment could not be employed to limit the admissibility of evidence seized by private individuals. The factual setting of Burdeau is closely analogous to that before us. There, the defendant sought to have suppressed incriminating evidence which had been wrongfully seized from his office by private corporate officials and their private investigators. That information had subsequently been turned over to the government for use in a criminal prosecution. Concluding, as we do here, that the seizure had been entirely independent of government involvement, the Supreme Court rejected the defendant's invocation of the Fourth Amendment.

> The papers having come into the possession of the Government without a violation of petitioner's rights by governmental authority, we see no reason why the fact that individuals, unconnected with the Government, may have wrongfully taken them, should prevent them from being held for use

in prosecuting an offense where the documents are of an incriminatory character. Burdeau v. McDowell, 256 U.S. 465, at 476, 41 S.Ct. 574 at 576.

Although the decision in *Burdeau* has been challenged several times following the Supreme Court's decision in Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960),[2] see United States v. McGuire, 381 F.2d 306, 313–314 (2d Cir. 1967), cert. denied 389 U.S. 1053, 88 S.Ct. 800, 19 L.Ed.2d 848 (1968), it has not been overruled. N. L. R. B. v. South Bay Daily Breeze, 415 F.2d 360, 363 (9th Cir. 1969). The defendant directs our attention to the opinion of this court in Knoll Associates, Inc. v. F. T. C., 397 F.2d 530 (7th Cir. 1968), urging that decision as authority for the application of the Fourth Amendment in this case. *Knoll Associates*, however, neither diminishes nor alters the *Burdeau* rationale. Indeed, as this court noted in the *Knoll* opinion, "the facts in this case are the antithesis of those in *Burdeau*," at p. 536, n. 5. In a case with a factual situation remarkably similar to the one before us, N.L.R.B. v. South Bay Daily Breeze, *supra*, the Ninth Circuit correctly distinguished *Knoll Associates* from *Burdeau*:

> A recent decision by the Seventh Circuit, Knoll Associates, Inc. v. F. T. C., 397 F.2d 530 (7th Cir. 1968), is not inconsistent with our reading of Burdeau. While there holding that evidence illegally seized by an employee should not have been admitted because of Fourth Amendment violations, the court stated that, "[t]he undisputed

---

1. The records turned over to the government show that the gross receipts of Tri-State's numbers operation totalled $2,170,341.77 for the eleven-month period. By comparison, the wagering tax forms signed by appellant Harper indicate gross receipts of only $188,080.00, a difference of $1,982,261.77. The tax actually paid on the amount originally reported was $18,808.00, whereas the amount of tax which should have been paid was $217,034.18.

2. While the argument has been occasionally made that the decision in *Elkins* holding

inadmissible in federal courts evidence seized by state officers in an unreasonable and unlawful manner (the "silver platter doctrine") has extended the Fourth Amendment's protection against unreasonable searches to unlawful private searches and thereby overturned the rule announced in *Burdeau*, no court has looked upon this contention with favor. United States v. Goldberg, 330 F.2d 30 (3d Cir. 1964), cert. denied, 377 U.S. 953, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964) ; United States v. McGuire, *supra*, at 314 ; 36 A.L.R.3d 553, 558.

evidence shows that [the disloyal employee] stole the documents for the purpose of assisting the Commission counsel in the prosecution of the proceeding then pending, and the record shows that the Commission by its use of the documents knowingly gave its approval to [the employee's] act." *Id.* at 533. This is conduct not countenanced by *Burdeau,* where the Court made pointed reference to the fact that government action was not present in the taking. 256 U.S. at 476, 41 S.Ct. 574, 65 L.Ed. 1048.

In Knoll, *supra,* the actions of the government and the thief were so related as to make the thief a government agent and his conduct unacceptable under long standing Fourth Amendment grounds. Gambino v. United States, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927).

N.L.R.B. v. South Bay Daily Breeze, 415 F.2d 360 at 363.

The same distinction applies to the facts of this case. Mattie Turnipseed obtained the records upon her own volition without any contact with or pressure from the government agents. Indeed, the records were acquired eight months prior to her first contact with the agents. In such a situation, the Fourth Amendment does not require that the evidence be excluded.

Having determined that the Tri-State records were properly admitted, we turn now to the question of whether the verdict was supported by the evidence. The defendant asserts that the government has failed to meet its burden of proof in that the evidence considered in the light most favorable to the government fails to prove beyond a reasonable doubt that the defendant believed or knew that the tax wagering forms were not accurate.

Harper was indicted under 26 U.S.C. § 7206(1) [3] which makes it a crime to subscribe any return which the subscribing party "does not believe to be true and correct as to every material matter." To sustain a conviction under this section, the government must prove that Harper signed the tax returns which he did not believe to accurately reflect the gross wagering receipts of Tri-State Enterprises. While it is undisputed that Harper signed the returns and that they grossly understated the gross wagering receipts of Tri-State, it is urged that the proof failed to establish that Harper knew or believed that they were false. To support this contention, the defendant points to the fact that the accountant was not certain whether Harper had ever personally delivered the information used by the accounting firm to complete the tax forms. In addition, he argues that the fact that the record was unclear as to whether the forms were presigned renders the question of knowledge doubtful.

█ We find that neither of these facts, taken alone or jointly, is determinative of the question of Harper's knowledge or belief that the returns were inaccurate. While it is true that proof of a signature alone on a tax return is insufficient by itself to make knowledge of the contents of that return attributable to the signor, United States v. Bass, 425 F.2d 161 (7th Cir. 1970); Lurding v. United States, 179 F.2d 419 (6th Cir. 1950), it is equally true that knowledge may be inferred from the facts and circumstances of the case and that the signature at the bottom of the

---

3. Section 7206(1) of the United States Code states:

Any person who—

(1) *Declaration under penalties of perjury.*—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;

\* \* \*

return is *prima facie* evidence that the signor knows the contents of the return. *Bass, supra,* at 163.

We note that Harper was given a copy of the total receipts for each drawing after such drawing was made. Further, we note that the weekly totals of Tri-State's gross receipts as compiled by Mattie Turnipseed were given to Harper and that he used these totals to prepare the weekly payroll for the "pick-up men." These facts, when coupled with the testimony that Harper ran the operation, hired the accounting firm which prepared the tax forms and paid the tax on the amounts actually reported, lead inescapably to the conclusion that Harper knew the forms were incorrect. We are not dealing with a small discrepancy between the amount reported and the amount actually due. Indeed, the disparity is enormous, totalling $1,982,261.-77. It is inconceivable that the active manager of a business concern, who was supplied with both daily and weekly gross receipt totals, would not be aware of a disparity of this magnitude.

The fact that Harper may not have personally delivered the information to the accountants is not determinative of the issue of wilfulness. We cannot accept his attempt to escape culpability behind this assertion of ignorance. As the First Circuit noted in Katz v. United States, 321 F.2d 7 (1st Cir. 1963) at 10:

> A return is not short of wilful falsity because the taxpayer chooses to keep himself uninformed as to the full extent that it is insufficient, or as to what exact figures should have been inserted. Innocence cannot outdistance ignorance.

In view of our finding that the incriminating evidence was properly obtained by the government and that it was sufficient to sustain the conviction, we affirm the district court.

Affirmed.

* [1] Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of