**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 09-4099**

_____

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

      v.

ERIK DEHLINGER,

              Defendant - Appellant.

_____

Appeal from the United States District Court for the District of
South Carolina, at Florence.   Terry L. Wooten, District Judge.
(4:06-cr-00900-TLW-1)

_____

Argued:  January 29, 2010          Decided:  March 5, 2010

_____

Before MOTZ, GREGORY, and DAVIS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Michael Louis Minns, Rain Levy Minns, THE MINNS LAW
FIRM, Houston, Texas, for Appellant. Gregory Victor Davis,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for
Appellee. **ON BRIEF:** Ashley Blair Arnett, THE MINNS LAW FIRM,
Houston, Texas; John M. Ervin, III, LAW OFFICE OF JOHN M. ERVIN,
III, Darlington, South Carolina, for Appellant.  John DiCicco,
Acting Assistant Attorney General, Alan Hechtkopf, Tax Division,
UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; W. Walter
Wilkins, United States Attorney, Columbia, South Carolina, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

On August 22, 2006, Dr. Erik Dehlinger ("Dehlinger") was indicted in the United States District Court for the District of South Carolina on one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371 and three counts of willfully filing false income tax returns in violation of 26 U.S.C. § 7206. The matter proceeded to trial and a jury found Dehlinger not guilty on the conspiracy charge and guilty as to the three tax evasion charges. On January 29, 2009, Dehlinger was sentenced to 42 months imprisonment. He now appeals his conviction and sentence. We affirm.

I.

From 1997 to 2002, Dehlinger was an emergency room doctor at McLeod Hospital in Florence, South Carolina. In 1997 and 1998, Dehlinger engaged the services of Hoyt Wayne Terry ("Terry"), a certified public accountant, to prepare his income tax returns. In 1998, Terry calculated Dehlinger's adjusted gross income to be $301,091, with an income tax liability of $85,188, and self-employment taxes of $16,342. Dehlinger had previously paid $49,510 of his tax liability and therefore owed an additional $52,200 to the Internal Revenue Service ("IRS"). Unbeknownst to Terry, however, Dehlinger never filed this, or the previous year's, tax return. In neither of these years did

2

Dehlinger report any financial information to Terry regarding a partnership or subchapter S corporation in which he had an interest.

Dehlinger claimed that his good fortune in avoiding the above-described tax liability resulted from his introduction by his co-worker, Dr. Raghavan Chari, to the Anderson's Ark and Associates' ("AAA") programs. AAA purported to serve as a tax, retirement planning, and investment company based in Costa Rica. AAA sold audiotapes and books and conducted seminars, providing advice on how to, allegedly legally, avoid personal income tax liabilities. In March 1999, Dehlinger purchased an AAA audiotape series entitled "Gateway to Financial Freedom," delivered by Guardian Management, an AAA affiliate.

Following this initial purchase, Dehlinger used several other programs marketed by AAA, including both the "Look Back" and "Look Forward" series. AAA and Guardian Management designed "Look Back" to enable its users to both avoid tax liabilities for the current year and also to "recapture" taxes paid in the two years prior to usage of the program. Under the "Look Back" program, a user would create a partnership with an AAA affiliate such that the customer held a 95% interest and the AAA affiliate held the remaining five percent interest. AAA would arrange for an entity known as "La Maquina Blanca" to make a loan directly to the AAA affiliate minority partner, in exchange for the

3

client's execution of a promissory note. The partnership would then use the loan funds to make a guaranteed payment to the AAA affiliate minority partner, allegedly for consulting and marketing services. In accordance with Section 707(c) of the Internal Revenue Code, a guaranteed payment to a partner for the performance of services constitutes a deductible ordinary business expense on the partnership's tax returns. 26 U.S.C. § 707(c). Because the partnership created by AAA reported zero or at most minimal income, the guaranteed payment resulted in a net loss for the partnership, which would then pass through to each of the partners in proportion to their ownership interests. The partners could use the loss to avoid paying taxes for the current year and to "recapture" taxes paid for the two preceding years.

In contrast to the "Look Back" program, the "Look Forward" program sought to avoid current income tax liability. Under the plan, AAA created a limited liability corporation ("LLC") for each client. The partnership created through the "Look Back" program would provide consulting services to the LLC. The LLC would then make a "consulting fee" payment to the partnership's bank account, over which the client had sole control. Again, the losses would "pass-through" to the client, resulting in losses on his or her income tax returns.

4

In reality, neither of these programs operated as it was purported to operate. Baton Venture, the partnership AAA created for Dehlinger as a part of the "Look Back" program, allegedly received a loan from La Maquina Blanca of $650,000 in time to make a guaranteed payment in that amount to Mason Advertising, the AAA-created minority partner, by December 30, 1998. In fact, Dehlinger neither signed the promissory note nor paid the loan fees until March 1999, both prerequisites for the funding of the loan, according to the note. Rather, Dehlinger backdated his signature to December 20, 1998. In addition, Dehlinger never made a payment on the loan or granted the creditor a security interest even though he signed both the loan agreement and promissory note. Finally, despite claiming a partnership loss of $646,594 because of the guaranteed payment, there is no record of such a payment made to Mason Advertising.

All in all, the partnership losses translated to a negative $335,167 adjusted gross income for Dehlinger in 1998 and a refund of nearly $45,000 when computed by the Guardian Management Company. Dehlinger filed a Form 1045 in that year, prepared by George Benoit ("Benoit"), a Guardian Management employee. This return sought refunds of $34,135 and $34,442 for taxes paid in 1996 and 1997. Dehlinger filed this return rather than the one Terry had previously prepared. Dehlinger's 1999 Form 1040, also prepared by Benoit, reported an income of

5

$240,164 from his medical practice. Again, however, Dehlinger reported no taxable income and no tax liability. On his 2000 Form 1040, Dehlinger again reported no taxable income and no tax liability. Dehlinger reported a partnership loss of $242,670 due to a $250,000 guaranteed payment to Mason Advertising, resulting in no tax liability despite an income from his medical practice of $240,164. In February 2002, Dehlinger used an AAA-affiliated CPA, Tara LaGrand ("LaGrand"), to prepare his 2001 tax returns. LaGrand also amended Dehlinger's 2000 tax return, using the "Look Back" program to recapture taxes already paid.

On August 22, 2006, a grand jury sitting in the District of South Carolina returned a four-count indictment charging Dehlinger with one count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and three counts of making and subscribing a false return, in violation of 26 U.S.C. § 7206(1). Dehlinger pled not guilty on all counts.

At trial, Dehlinger testified on his own behalf, claiming that Dr. Chari had convinced him that the programs sold by AAA were legitimate means of avoiding income taxes. Dehlinger denied knowing that the various components of the program were illegitimate. He claimed that at the time he filed the returns, he did not believe that he was committing fraud by taking deductions related to the AAA programs. He also asserted that he relied on his tax return preparers and the AAA principals,

6

including LaGrand, in filing the returns that reported zero tax due and owed.

Following a five-day jury trial, the jury convicted Dehlinger on three counts of making and subscribing a false return, and acquitted him on the conspiracy to defraud count. On January 7, 2009, the district court sentenced Dehlinger to 42 months' incarceration, to be followed by one year of supervised release. The court also ordered him to pay restitution of $363,207, a fine of $5,000, and a $300 special assessment.

## II.

Dehlinger challenges his conviction principally on the ground of ineffective assistance of counsel, claiming that his attorney had a conflict of interest that impaired his representation of Dehlinger. Dehlinger also challenges the district court's (1) denial of his motion for a mistrial after a witness volunteered testimony previously ruled to be inadmissible hearsay; (2) admission of testimony from an undercover IRS agent regarding his experience with AAA programs; and (3) calculation of his base offense level and imposition of a sentencing guidelines enhancement for obstruction of justice. We address these issues in turn.

A.

Whether defendant's trial counsel had a conflict of interest presents a mixed question of law and fact, reviewed de novo by this court. See Mickens v. Taylor, 240 F.3d 348, 360 (4th Cir. 2001) (en banc), aff'd, 535 U.S. 162 (2002); Williams v. French, 146 F.3d 203, 212 (4th Cir. 1998).

This court considers ineffective assistance claims on direct appeal only if it "'conclusively appears' from the record that defense counsel did not provide effective representation." United States v. Gastiaburo, 16 F.3d 582, 590 (4th Cir. 1994) (citations omitted); United States v. Baldovinos, 434 F.3d 233, 239 (4th Cir. 2006); United States v. Richardson, 195 F.3d 192, 198 (4th Cir. 1999); United States v. King, 263 Fed. App'x 332, 333 (4th Cir. 2008). The reason for this restriction is that, generally, a motion under 28 U.S.C. § 2255 in the district court is preferable than direct appeal, so that the parties may adequately develop the record. Gastiaburo, 16 F.3d at 590 (citations omitted); United States v. King, 119 F.3d 290, 295 (4th Cir. 1997).

The Supreme Court has held that criminal defendants have a Sixth Amendment right to conflict-free representation by counsel. Cuyler v. Sullivan, 446 U.S. 335, 345-50 (1980); Holloway v. Arkansas, 435 U.S. 475 (1978). A defendant seeking a new trial must show "'some real conflict of interest . . . .

8

resulting from [overlapping] representation [of two clients]'"
to succeed on this Sixth Amendment claim. United States v.
Atkinson, 565 F.2d 1283, 1284 (4th Cir. 1977) (quoting United
States v. Lovano, 420 F.2d 769, 772 (2d Cir. 1970)). The mere
fact of overlapping representation is insufficient to create a
Sixth Amendment violation. See id. Rather, a defendant must
establish that (1) his attorney labored under "an actual
conflict of interest" that (2) "adversely affected his lawyer's
performance." Sullivan, 446 U.S. at 348; Strickland v.
Washington, 466 U.S. 668, 691-92 (1984); United States v. Stitt,
552 F.3d 345, 350 (4th Cir. 2008), cert. denied, 130 S. Ct. 65
(2009); United States v. Tatum, 943 F.2d 370, 375 (4th Cir.
1991).

Dehlinger claims that his attorney, Scott Engelhard, Esq.
("Engelhard") had a conflict that arose from the latter's
representation of him, LaGrand (the AAA-affiliated CPA who
prepared his 2001 tax returns and amended his 2000 tax returns),
and Collis Redd ("Redd"), an AAA tax planner. According to
Dehlinger, Engelhard refused to call LaGrand as a witness during
his trial, even though LaGrand could have offered exculpatory

9

evidence, because Engelhard's loyalties were divided between the two clients.[1]

Here, although Dehlinger raises more than a colorable claim that Engelhard's loyalties were impermissibly divided, a review of the record shows that the facts are not conclusive. It is not for this court to determine the character, duration, and extent of Engelhard's representation of Dehlinger, LaGrand, and Redd, in the first instance, and whether his representation of these individuals created actual conflict that adversely affected his representation of Dehlinger. Indeed, we decline to comment on these issues. Although, at Dehlinger's insistence, the district court conducted limited, non-evidentiary post-verdict proceedings to examine Dehlinger's allegations against Englehard, we agree with the court's conclusion that the facts and circumstances presented by this record should be evaluated by a district judge acting on an adequate factual record in an orderly post-conviction proceeding rather than on the basis of dueling affidavits and declarations. Accordingly, we hold that Dehlinger has not "conclusively" established the existence of an

---

[1] According to Dehlinger, LaGrand could have testified that her clients, Dehlinger included, believed that AAA's tax strategies were legal. Ostensibly, LaGrand's testimony would have contradicted the government's evidence of Dehlinger's willful violation of the tax laws. Dehlinger further argues that LaGrand's testimony previously exculpated defendants in related and similar prosecutions in other federal districts.

actual conflict of interest that adversely affected Engelhard's representation of Dehlinger.[2]

## B.

We review a district court's refusal to grant a mistrial for abuse of discretion. United States v. West, 877 F.2d 281, 287-88 (4th Cir. 1989). An abuse of discretion is found "only under the most extraordinary of circumstances" and requires that a defendant have experienced prejudice. United States v. Dorlouis, 107 F.3d 248, 257 (4th Cir. 1997). A defendant cannot prove prejudice if a jury "could make individual guilt determinations by . . . appraising the independent evidence against each defendant," but rather this court must find that there is a "reasonable possibility" that the error influenced the jury's verdict. United States v. Porter, 821 F.2d 968, 972 (4th Cir. 1987); United States v. Seeright, 978 F.2d 842, 849 (4th Cir. 1992). A district court can generally prevent prejudice to a defendant by "a cautionary or limiting instruction, particularly if the danger of prejudice is slight in view of the overwhelming evidence of guilt." United States v. Ham, 998 F.2d 1247, 1254 (4th Cir. 1993) (quoting United States v. Masters, 622 F.2d 83, 87 (4th Cir. 1980); see also

---

[2] In light of our holding, we deny Dehlinger's motion to file a supplemental brief.

United States v. Johnson, 610 F.2d 194, 196-97 (4th Cir. 1979) ("The general rule is that if evidence which may have been taken in the course of a trial be withdrawn from the consideration of the jury by the direction of the presiding judge, that such direction cures any error which may have been committed by its introduction.").

Here, the district court did not abuse its discretion in denying Dehlinger's motion for a mistrial after William Cauthen, Jr. ("Cauthen") offered testimony that the court had previously deemed inadmissible and subsequently ordered stricken. The district court had ruled that Cauthen could not characterize anything on the AAA website as "right wing or fringe." In response to the prosecutor's inquiry of his "impression of the information that [he] saw on the AAA website," however, Cauthen stated that he "thought the information that I saw there was sort of fringe material, right wing material, and that potentially it could be fraud." Upon Dehlinger's objection and motion for a mistrial, the district court ordered the statement stricken from the record. The district court refused to grant a mistrial. During final instructions the district court reminded the jury that "if any evidence was stricken from the record, [they] should not consider that evidence in making [their] decision."

12

Cauthen's statement was one line in a four-day trial replete with evidence establishing Dehlinger's guilt, including signed fraudulent tax returns. The district court quickly ordered the statement stricken and, before deliberations, reminded the jury not to consider such evidence. See United States v. Harris, 165 F.3d 1062, 1066 (6th Cir. 1999) (affirming the district court's denial of a motion for mistrial after a brief reference to a prior arrest where "the district court gave an immediate and clear limiting instruction"); Black v. Shultz, 530 F.3d 702, 707 (8th Cir. 2008) (affirming the district court's refusal to grant a mistrial given the fact that the court "gave a curative instruction" after a single statement was made in violation of the court's order). And although Dehlinger claims before us that the statement was devastating to his defense, he does not state how the statement made about the AAA website prejudiced him or what impact it likely had on the jury's determination of his guilt. See United States v. Baumgarten, 517 F.2d 1020, 1030 (8th Cir. 1975) (denying defendant's motion for a mistrial where witness' brief reference to defendant's previous arrest was "of very little significance"); United States v. Butler, 71 F.3d 243, 255 (7th Cir. 1995) (holding that a prosecutor's lone comment did not warrant a mistrial as it "was a single, isolated, indirect remark").

13

C.

The decision whether to admit evidence is properly within a district court's discretion; thus, we review a district court's admission of evidence for abuse of discretion. United States v. Hodge, 354 F.3d 305, 312 (4th Cir. 2004); United States v. Lancaster, 96 F.3d 734, 744 (4th Cir. 1996). A district court abuses its discretion "only when it can be said that [it] acted arbitrarily or irrationally in admitting evidence," something that occurs only under "the most extraordinary of circumstances." United States v. Williams, 445 F.3d 724, 732 (4th Cir. 2006) (citing United States v. Simpson, 910 F.2d 154, 157 (4th Cir. 1990)); see also United States v. Heater, 63 F.3d 311, 325 (4th Cir. 1995) ("[I]n order to find a district court's error harmless, we need only be able to say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'") (quoting United States v. Nyman, 649 F.2d 208, 211–12 (4th Cir. 1980)).

1.

Fed. R. Evid. 701 allows lay witnesses to express opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge within the

scope of [expert testimony]." In addition, courts have held that lay testimony generally requires that the opinion offered be "the product of reasoning processes familiar to the average person." See United States v. Garcia, 413 F.3d 201, 215 (2d. Cir. 2005); United States v. Cooks, 589 F.3d 173, 180 (5th Cir. 2009).

Dehlinger argues that the district court impermissibly allowed lay witnesses to offer "expert testimony" designed to show that he possessed a guilty state of mind during his interactions with AAA. At trial, the district court permitted Cauthen to offer testimony about the AAA website. As just discussed, however, the court ordered testimony characterizing the website as "fringe," stricken from the record and instructed the jury to disregard it. The court also permitted Special Agent Mike Preiss, who conducted an undercover investigation into the operation of AAA, to testify about investors' relationships with AAA, specifically focusing on Dehlinger. In permitting such testimony, the court reasoned that the testimony would "provide some evidence for the jury to consider in terms of what actually went on at [AAA] and what the process was." As a witness, Preiss compared the partnership documents AAA sent him while he was undercover with those that Dehlinger had obtained from AAA and testified to his understanding of how the AAA programs worked, and specifically, that he was to receive about $300,000 in tax

15

savings. Preiss also noted the existence of similar statements about tax benefits in an executive summary AAA sent to Dehlinger. Preiss further discussed and compared plan documents that he had received from AAA with those Dehlinger had in his possession. To his knowledge, Preiss indicated that the partnerships and companies created by AAA conducted no business of their own, as indicated in their income tax returns which listed no gross income or receipts and included only minimal expenditures, other than the guaranteed payment at issue. And even though the partnership agreement explicitly set out the various responsibilities of each partner to the agreement, the partners never performed any of these duties. Priess testified that, based on his experience with AAA, he was not obligated to repay the loan for which he had cosigned and that was subsequently used to fund the guaranteed payment to his AAA-affiliated partner.

Dehlinger claims that Cauthen's and Preiss's testimony amounted to impermissible expert testimony because their statements demonstrate that Dehlinger knew the information on the AAA website was illegitimate and that Dehlinger had the same guilty state of mind as Preiss did during his interactions with AAA, respectively. This argument fails. The testimony at issue in this case is not, in either purpose or effect, that of an expert. Both witnesses merely offered their opinion of their

16

individual experiences with AAA, making deductions and drawing inferences that an "average person" would similarly be capable of in an identical situation. Neither Cauthen nor Priess testified about Dehlinger's mental state or whether he knowingly violated the tax laws. Cauthen limited his statements only to his personal impressions of the AAA website, which were later stricken, as previously discussed. Preiss's testimony was restricted to his own knowledge of, and experience with, AAA. He offered his personal impressions of AAA and the similarities inherent in the documents AAA provided to him and those Dehlinger received. He did not, as Dehlinger would have us believe, proffer testimony suggesting that Dehlinger himself possessed a felonious intent. He never testified or even hinted that, because he believed AAA's programs were illegal, Dehlinger must have believed they were illegal as well. In short, neither Cauthen nor Priess testified to the ultimate issue of Dehlinger's willfulness as an expert witness would have.

### 2.

Where admission of lay testimony is challenged as bordering on expert opinion, testimony that has no direct effect upon proof of the elements of the substantive offenses charged, will not be overturned, particularly if there is sufficient evidence elsewhere in the record upon which the jury could have found the defendant guilty. See Fed. R. Crim. P. 52(b)).

17

Dehlinger was found guilty of three counts of willfully filing false income tax returns. One of the elements proved by the government was that Dehlinger voluntarily and intentionally violated a known legal duty. Cheek v. United States, 498 U.S. 192, 201 (1991). Even discounting Priess's testimony, there was sufficient evidence of willfulness. For instance, the government presented evidence that, in 1998, Dehlinger had accurate Form 1040s prepared by Terry. Dehlinger, however, did not file this form or inform Terry that this form was incorrect. Rather, Dehlinger signed and filed a tax return that claimed a refund of all taxes paid to a AAA partner. This evidence shows that Dehlinger knowingly filed fraudulent tax returns. See United States v. Mohney, 949 F.2d 1397, 1407 (6th Cir. 1991) ("A taxpayer's signature on a return does not in itself prove his knowledge of the contents, but knowledge may be inferred from the signature along with the surrounding facts and circumstances, and the signature is prima facie evidence that the signer knows the contents of the return.") (citing United States v. Harper, 458 F.2d 891, 894 (7th Cir. 1971)); United States v. Drape, 668 F.2d 22, 26 (1st Cir. 1982) (holding that a defendant's signature is sufficient to establish knowledge once it has been shown that the return was false). The district court did not abuse its discretion in refusing to grant a mistrial.

D.

We review a district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error. United States v. Osborne, 514 F.3d 377, 387 (4th Cir. 2008), cert. denied, 128 S. Ct. 2525 (2008); United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989). If a defendant fails to raise a timely objection during sentencing, however, we review the district court's actions for plain error. See United States v. Olano, 507 U.S. 725, 731-32 (1993); United States v. Uzenski, 434 F.3d 690, 711 (4th Cir. 2006); United States v. Lynn, Nos. 08-5125, 08-5126, 08-5132, 09-4341, _ F.3d _, 2010 WL 322176 (4th Cir. Jan. 28, 2010).

Dehlinger claims that the district court improperly sentenced him when it (1) took into account three years of tax losses for which he was not indicted or convicted and (2) increased his offense level by two levels for obstruction of justice. As to the former issue, the district court properly took into account three years of tax losses for which Dehlinger was not indicted in calculating his base offense level. When an offense involves tax evasion or filing fraudulent tax returns, the Sentencing Guidelines calculates a defendant's base offense level on the attempted tax loss, defined as "the total amount of loss that was the object of the offense." U.S.S.G. § 2T1.1(c)(1); United States v. Delfino, 510 F.3d 468, 472 (4th

19

Cir. 2007). Tax loss is loss attributable to the offense of conviction and any other loss due to relevant conduct, including "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," U.S.S.G. § 1B1.3(a)(1), and all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction, U.S.S.G. § 1B1.3(a)(2). "[A]ll conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated." U.S.S.G. § 2T1.1 comment (n.2); United States v. Ervasti, 201 F.3d 1029, 1042 (8th Cir. 2000).

Here, the presentence investigation report recommended a tax loss of $363,207, which included tax loss for the six-year period from 1996 to 2001. During sentencing, Dehlinger did not object to the very inclusion of tax losses from 1996, 1997, and 1998. Rather, Dehlinger objected to the inclusion of those tax losses only to the extent that they did not reflect deductions to which he may have been entitled. The district court did not err in overruling Dehlinger's objection and including tax losses from 1996 to 1998 because it was shown at trial that Dehlinger

20

used the same AAA programs and made the same types of deductions in those three years as the subsequent three years for which he was indicted and convicted. See Ervasti, 201 F.3d at 1042 (using "fraud loss," which defendant conceded to be $5,747,478.88, rather than "tax loss," to which she did not "ascribe a precise value," as the basis for calculating the base offense level in a mail fraud case in which the defendant misappropriated impounded tax monies from clients of their payroll processing corporation); see also United States v. Hayes, 322 F.3d 792, 801-02 (4th Cir. 2003) (vacating a sentence because the district court did not consider all relevant evidence in determining the applicable tax loss).

As to the second of Dehlinger's sentencing issues, the district court did not err in increasing Dehlinger's offense level by two levels for obstruction of justice. The Sentencing Guidelines allow a two level increase if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1; United States v. Puckett, 61 F.3d 1092, 1095 (4th Cir. 1995). Obstruction of justice includes committing perjury at trial. U.S.S.G. § 3C1.1, comment (n.4(b)). A district court applying an enhancement based on obstruction of justice must necessarily

21

find, by a preponderance of the evidence, that the defendant (1) gave false testimony, (2) concerning a material matter, (3) with the willful intent to deceive while under oath. United States v. Dunnigan, 507 U.S. 87, 92-98 (1993); United States v. Sun, 278 F.3d 302, 314 (4th Cir. 2002) (citing United States v. Smith, 62 F.3d 641, 646 (4th Cir. 1995)).

The district court found that Dehlinger committed perjury when he testified (extensively) under oath that he relied on others, taking advice from his accountant and financial planner, as well as Dr. Chari, regarding the legality and soundness of the AAA programs. Specifically, Dehlinger claimed that he took certain deductions "because Richard Marks and George Benoit said they were appropriate deductions." Tr. 108. As an initial matter, the district court's enhancement for perjury did not constitute double counting (even though Dehlinger's crime constituted lying to the IRS) because the crime for which he was convicted was completed by the time he went on trial. Indeed, his crime was complete after he had filed the fraudulent tax returns. Lying under oath constitutes a new and different circumstance designed to hide the already completed crime. In short, the conduct underlying Dehlinger's conviction is different from the conduct upon which the district court based its enhancement.

Second, the district court properly reasoned that, since the jury found Dehlinger guilty of all tax evasion charges, it must have rejected all of his testimony regarding good faith and lack of willfulness. During sentencing, the district court discussed at length its reasons for enhancing Dehlinger's sentence; namely, that Dehlinger (1) gave false testimony, (2) concerning a material matter, (3) with the willful intent to deceive while under oath. The district court said,

> [Defendant's] testimony was to say, if it is detrimental reliance, if that is the description, the proper description, it may well be; but it was more specific about what was going on, what I did and, gosh, I really did not know that this was not on the up and up. And it seems that the jury evaluated that testimony and the jury found the defendant guilty and ignored that testimony altogether. . . .

> But [defendant] was very specific about what he had done and the fact that it was not bad motive or criminal intent by him; but the specifics were such that, it seems to me, there was a rejection of those facts. . . . But the testimony was detailed and specific about what happened; and he asked the jury to rely on his position that he did not know what was up in light of a lot of evidence that indicated that he knew some of the things that were going on simply were not legal, and ultimately the jury concluded they were criminal.

Sent. Tr. 34-38. These observations by the district court support its determination that Dehlinger committed perjury for the sole purpose of deceiving the jury regarding his culpability and involvement with AAA. The district court therefore properly sentenced Dehlinger.

23

III.

For the foregoing reasons, we affirm Dehlinger's conviction and sentence, without prejudice to any post conviction claim based on ineffective assistance of counsel that appellant may elect to pursue.

AFFIRMED