**UNITED STATES of America, Appellee,**

v.

**Isaac James TINDLE, a/k/a
I.J., Appellant.**

No. 84–5036.

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 14, 1985.

Decided Dec. 29, 1986.

Henry W. Asbill (Timothy D. Junkin; Asbill, Junkin & Myers, Chtd., on brief), for appellant.

Ty Cobb, Asst. U.S. Atty. (J. Frederick Motz, U.S. Atty., Donna H. Triptow, Asst. U.S. Atty., on brief), for appellee.

Before MURNAGHAN and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

This case was held in abeyance pending the Supreme Court's decision in *Batson v. Kentucky*, —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In view of the Supreme Court's recent decision in that case, we remand for the district court to ascertain whether blacks were systematically excluded from the jury in violation of the Equal Protection Clause through the government's use of its peremptory challenges. Since there may be a retrial depending on the district court's finding and since a number of other issues were raised we express our view respecting them to promote a final and definitive resolution of this case.

I

Isaac James Tindle appeals his conviction for heroin related offenses. On April 20, 1983, Tindle was indicted with thirteen other individuals in the United States District Court for the District of Maryland. Tindle was charged with 1) conspiracy to possess and distribute heroin (21 U.S.C. § 846); 2) actual distribution of heroin on June 8, 1982, September 15, 1982, September 30, 1982, and November 17, 1982 (21 U.S.C. § 841(a), 18 U.S.C. § 2); and 3) unlawful use of a communications facility (a telephone) in furtherance of the conspiracy (21 U.S.C. § 843(b), 18 U.S.C. § 2). At his arraignment on April 26, 1983, Tindle pled not guilty to all charges. He was ordered held on a twenty million dollar surety bond.

On June 22, 1983, Tindle was charged, in a separate indictment, with conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848. He was arraigned on June 30, 1983 and, again, pled not guilty.[1]

---

1. On June 30, 1983, at the conclusion of a bond reduction hearing, the district court reduced Tindle's bond to four million dollars.

Pursuant to the government's motion, the two indictments were ordered joined for trial. Tindle was tried alone (the other twelve co-defendants were either fugitives, had pled guilty, or had been severed). The trial began on October 11, 1983. On November 10, 1983, the jury found Tindle guilty of all counts in the original indictment. He was acquitted of the continuing criminal enterprise charge contained in the second indictment.

On January 5, 1984, Tindle was sentenced to an aggregate prison term of fifty years. Judge Harvey also imposed a ten year Special Parole Term and a $150,000 fine.

## II

In 1971, Tindle was convicted of selling heroin. After his release from prison in 1976 through April 1983 (when he was indicted), Tindle allegedly acquired a fortune selling heroin in Washington, D.C. Tindle's drug operation was highly sophisticated and extensive. It was also marked by widespread violence.

The documentary and financial evidence admitted at trial established that Tindle had a lavish lifestyle presumably made possible by his involvement with heroin. The government demonstrated that in 1977, following his release from prison, Tindle spent $18,878.05. In 1978, the evidence revealed that Tindle spent $79,183.04. The figure for 1979 was $155,863.56 and in 1980, 1981, and 1982 he spent $365,909.74, $438,867.07, and $282,825.36, respectively. The government further informed the jury that a search of Tindle's home revealed jewelry, furs, expensive furnishings, multiple sky lights and fireplaces, and other trappings of wealth.

To substantiate its contention that Tindle's flamboyant lifestyle stemmed from his heroin operation, the government introduced, *inter alia*, "narcotics debt sheets" found in Tindle's basement fireplace which purported to list numerous high-priced drug transactions. The government also admitted large quantities of cutting material, various drug paraphernalia and two handguns found in the home of one of Tindle's lady friends. In addition, the jury learned that searches of the residences of Tindle's principal associates uncovered additional narcotics debt sheets, weapons, and bulletproof vests.

The government then sought to establish that Tindle, with the assistance of his attorney, Herbert Suskind, attempted to secret his drug-generated income by engaging in "under the table" payments in connection with certain real estate transactions, reporting substantial gambling income on his tax returns, and securing discarded racetrack tickets in an effort to support his gambling claims. Tindle also allegedly lent money, using Suskind as an intermediary, to an independent businessman who repaid Tindle with cash and created fraudulent W–2 income forms for 1980–81. The forms stated that Tindle earned his living as a gas station attendant.

## III

We will address Tindle's assignments of error seriatim. Tindle first contends that the district court committed reversible error in refusing to require the government to copy and release to the defense counsel all of the business and financial records of Tindle in its possession. Tindle claims that he was entitled to said records pursuant to Fed.R.Crim.P. 16(a)(1)(A).[2] In a related argument, Tindle

---

**2.** Rule 16. Discovery and Inspection

(a) Disclosure of Evidence by the Government.

(1) Information Subject to Disclosure.

(A) Statement of Defendant. Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to

contends that the district court committed reversible error by refusing to grant a ninety day continuance; the one week continuance permitted allegedly rendered it impossible for defense counsel to pore over the documents and fully prepare himself for trial.

The appellant moved the court to order the government to copy and release all of Tindle's financial records in the government's possession. The appellant offered to bear the reproduction costs. The government claimed that it had already delivered thousands of documents to Tindle and that it would be unwieldy and fruitless to copy all of the other documents requested. The government asserted that it had already reviewed the materials and had determined that they did not contain any exculpatory information. The government suggested, however, that if Tindle or his attorney deemed any documents relevant, the government would furnish them with copies. On August 19, 1983, the district court denied Tindle's motion and ruled that Tindle, his lawyer and either Suskind or Hughes (Tindle's real estate partner and advisor) could view the financial documents in the prosecutor's office. Mrs. Tindle was not permitted in the room with her husband. The district court further ruled that Tindle should be supplied with copies of documents he or his attorney determined were helpful to his defense.

In September, Tindle again moved the court to order the government to copy and release all of the business records and/or to grant a ninety day continuance to allow defense counsel to review said records. The district court did not order the copying and release of all documents, but it did modify its August order in the appellant's favor. The district court ruled that Mrs. Tindle would now be able to peruse the documents in the same room (at the same time) as her husband and that DEA agents should not be permitted in the room while Tindle and his entourage were viewing the documents; only U.S. Marshals were permitted in the conference room. The district court also granted the appellant an eight day continuance to enable his counsel further to prepare for trial.

The district court's rulings were reasonable under the circumstances. Although he did not order the government to copy the documents (at the appellant's expense), he permitted the appellant to have access to all of the records and to copy those he deemed relevant. The district court took note of the fact that between its August and September orders, Tindle did not take many trips to examine the documents and did not have many copies made. The district court appears to have viewed the infrequent trips as an indication that the documents would not greatly aid Tindle's defense and that defense counsel was simply asserting a need for the entire mountain of documents as a dilatory tactic.

Not only did Tindle's apparent lack of interest in the documents (as evidenced by the few trips to the prosecutor's office) influence the court to refuse Tindle's request for copies of the thousands of records but it also apparently influenced the district court to disallow a continuance for longer than eight days. In other words, the district court presumably regarded the appellant's plea for more preparation time with skepticism since the defense counsel had failed to make effective use of the discovery time already granted.

In sum, in light of the fact that defense counsel failed to take full advantage of his ability to review and copy documents that would perhaps have aided his client, the district court did not abuse its discretion with regard to the discovery matters and the continuance.[3] *See* Fed.R.Crim.P.

---

the defendant to be a government agent; and recorded testimony of the defendant before a grand jury which relates to the offense charged.

**3.** In another somewhat related argument, Tindle contends that he was denied the effective assist-

ance of counsel because his attorney was forced to try the case before he was fully prepared. Given Tindle's attorney's success in securing Tindle's acquittal of the more serious charge ("continuing criminal enterprise") and given his attorney's infrequent trips to the prosecutor's document room (the suggestion being that he

16(d)(1). *See also United States v. Sellers,* 658 F.2d 230, 231 (4th Cir.1981) ("Only when a court's refusal to grant a motion for a continuance can be deemed arbitrary and fundamentally unfair will such a refusal be deemed an abuse of discretion.").

Tindle next asserts that the government did not in its plea agreement entered with Suskind require Suskind to testify at trial solely as a device to preclude Suskind's use as a witness for the defense. Tindle additionally claims that the government acted improperly in refusing to grant Suskind use immunity since such failure resulted in the suppression of exculpatory evidence. Tindle further asserts that the government requested the district court to postpone the sentencing of Suskind until after Tindle's trial in order to intimidate Suskind and render him unavailable as a witness.

## A. *The Plea Agreement and the Timing of Suskind's Sentencing*

■ Although Tindle endeavors to create a very dramatic scenario in which the government and district court scheme to keep Suskind out of the defense's reach, his attempts fail in light of existing facts. The government did not persuade or coax Suskind not to testify for Tindle nor did it omit a requirement that Suskind testify at trial in the plea agreement in order to hamper the defense. Rather, Suskind, fearing for his life and that of his wife, children, and father, told the government, during plea negotiations, that he adamantly refused to testify at trial. The government, faced with an unyielding Suskind, took what it could get to obtain a conviction without the necessity of a full-blown trial. It did succeed in conditioning Suskind's plea agreement on cooperation before the grand jury.

■ Likewise, the district court acted properly in postponing Suskind's sentencing until after Tindle's trial. Tindle states that the sentencing was delayed in order to send Suskind "the powerful message that

was not *forced* to try the case in an unprepared fashion but rather strategically chose to spend his time on more fruitful witnesses/exhibits),

if he did take the stand, and if his testimony was disbelieved by the court it would cost the witness dearly at a later time (*i.e.* sentencing)." However, the district court was simply deferring sentencing until it could assess the full extent of Suskind's truthfulness and cooperation with the government. *Cf. United States v. Grayson,* 438 U.S. 41, 50–51, 98 S.Ct. 2610, 2615–2616, 57 L.Ed.2d 582 (1978) ("A defendant's truthfulness or mendacity while testifying on his own behalf [may be considered probative of defendant's] prospects for rehabilitation and hence relevant to sentencing."). Arguably, postponing sentencing until after Tindle's trial could have encouraged (instead of discouraged) Suskind to testify since, if Suskind testified truthfully, his honesty would have perhaps resulted in a more lenient sentence. The truthfulness would be present whether the testimony favored the government or the defendant. The district judge, a neutral adjudicator interposed between conflicting parties is interested in the quality of the testimony not in whether it favors one party or the other. We refuse to accept the premise implicit in Tindle's position that Suskind should have been allowed indeed propelled, if not compelled, to testify *falsely* without worrying about repercussions at the time of sentencing.

## B. *Suskind's Fifth Amendment Privilege*

■ On November 1, 1983, Tindle called Suskind as a witness for the defense. Suskind invoked his fifth amendment privilege and refused to testify. After conducting a hearing on the issue, the district court ruled that Suskind's claim of privilege was valid, and refused to compel his testimony. The appellant contends that the district court's ruling was improper because Suskind had already pled guilty to the charges levelled against him and because there was no longer any legitimate threat of further prosecution.

the court rejects his ineffective assistance of counsel argument.

The appellant's argument must fail since it cannot be unequivocally stated that Suskind did not have legitimate fears of incurring additional criminal liability as a result of his varied and sordid business transactions with Tindle and other individuals. *See United States v. Pardo*, 636 F.2d 535, 544 (D.C.Cir.1980) ("[A] witness does not lose his Fifth Amendment right to refuse to testify concerning *other* matters or transactions not included in his conviction or plea arrangement."). *See also United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir.1978), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978) (potential defense witness convicted, *but not yet sentenced*, could validly assert fifth amendment privilege since "from the record one cannot say that [the potential witness] did not legitimately fear incurring additional criminal liability from any testimony he could give on behalf of [a co-defendant]"); *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951) (Fifth Amendment privilege against self-incrimination is "confined to instances where witness has reasonable cause to apprehend danger from a direct answer."). Also, Suskind could have properly asserted his fifth amendment privilege if Suskind's testimony at trial were to reveal that he had perjured himself during his grand jury testimony. *See United States v. Partin*, 552 F.2d 621, 632 (5th Cir.1977), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977) ("[A] witness may not claim the privilege out of fear that he will be prosecuted for perjury for what he is about to say, although he may claim the privilege if his new testimony might suggest that he had perjured himself in testifying on the same subject at a prior proceeding."). The plea agreement between the government and Suskind specifically provided that nothing in the agreement would be construed to protect Sus-

kind in any way from prosecution for perjury.

Thus, we conclude that the district court correctly ruled that Suskind could validly refuse to testify.

## C. *Immunity*

■ The appellant acknowledges that the government has exclusive statutory authority to grant use immunity to a potential witness. *See* 18 U.S.C. § 6003; *see also United States v. Karas*, 624 F.2d 500, 505 (4th Cir.1980), *cert. denied*, 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981) (The district court has no authority to confer immunity *sua sponte*); *United States v. Klauber*, 611 F.2d 512, 517 (4th Cir.1979), *cert. denied*, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980); *United States v. Rocco*, 587 F.2d 144, 147 (3d Cir.1978), *cert. denied*, 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979) ("[I]t has been uniformly accepted that the grant or denial of immunity is within the sole discretion of the executive branch of government and that neither the courts nor defense counsel may force the prosecutor to compel the testimony of a defense witness."). However, the appellant contends that the district court committed error in the instant case by failing to invoke its inherent authority to dispense immunity to Suskind. The appellant claims that district courts have exercised such authority when it has been necessary to safeguard a defendant's right to essential exculpatory information, when the prosecutor one-sidedly immunizes certain witnesses who testify for the government but refuses to grant reciprocal immunity to other witnesses who might give helpful testimony for the defendant, and when the prosecutor by threats or other misconduct intimidates a defense witness into refusing to testify. *See, e.g., Government of Virgin Islands v. Smith*, 615 F.2d 964, 968–69 (3d Cir.1980); [4] *Earl*

---

4. The holding in *Government of Virgin Islands v. Smith* has been soundly criticized on a number of grounds and is clearly the minority view among courts which have considered the issue. *Mattheson v. King*, 751 F.2d 1432 (5th Cir.1985), *cert. dismissed*, —— U.S. ——, 106 S.Ct. 1798, 90 L.Ed.2d 343 (1986); *United States v. Pennell*, 737 F.2d 521, 527 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985); *United States v. Hunter*, 672 F.2d 815 (10th Cir. 1982); *United States v. Thevis*, 665 F.2d 616, 639

*v. United States*, 361 F.2d 531, 534 n. 1 (D.C.Cir.1966), *cert. denied*, 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967).

Tindle, however, has not only failed to make a decisive showing that he has been the victim of prosecutorial misconduct or overreaching, but he has also failed to demonstrate that Suskind would have supplied evidence clearly 1) material, 2) exculpatory, and 3) unavailable from any other source (such as his accountant, real estate partner, or wife). In light of Tindle's weak showing, and in light of the generally accepted view that a defendant has no right to defense witness immunity,[5] we conclude that the district court did not err in refusing to grant use immunity to Suskind. After a close examination of the record, the court is convinced that Tindle made unsubstantiated allegations and used hyperbolic language when describing the government's conduct and the materiality and exculpatory nature of Suskind's supposed testimony.

■ We next consider Tindle's contention that the district court abused its dis-

cretion in disallowing Tindle to call an undercover DEA agent as a witness. DEA Special Agent Kenneth Feldman, acting in an undercover capacity, had posed as a drug dealer seeking Herbert Suskind's assistance in laundering drug proceeds. On one occasion, government officers videotaped an undercover meeting between Feldman, an IRS agent, Herbert Suskind, and his accountant brother, David. Tindle sought to introduce the videotape through Feldman.

Tindle's attorney proffered that Feldman would testify that Suskind discussed Tindle's criminal activity without Tindle's permission, that the government was trying to entrap Tindle in criminal activity through Suskind, and that Tindle rejected opportunities to engage in drug deals with Feldman when Suskind offered them. After hearing Tindle's proffer, the district court determined that Feldman's testimony and the videotape, even if perhaps relevant, were cumulative and thus excludable pursuant to FRE 403. That is, even assuming that Suskind's taped comments to Feldman,

---

(5th Cir.1982), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

**5.** *See Thompson v. Garrison*, 516 F.2d 986, 988 (4th Cir.1975), *cert. denied*, 423 U.S. 933, 96 S.Ct. 287, 46 L.Ed.2d 263 (1975):

Thompson's insistence that the district judge should have guaranteed Sings immunity and compelled him to testify by invoking 18 U.S.C. § 6002 is based on a misconception of the law. A district judge is not authorized to initiate immunity. The statute places this responsibility on the United States Attorney, who can act only after receiving approval from the Attorney General, his deputy or an assistant. 18 U.S.C. § 6003. The function of the district court is limited to determining whether the government's request for immunity complies with the statutory procedure. *See also United States v. Turkish*, 623 F.2d 769, 773–74, 777–78 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981):

The established content of the Sixth Amendment does not support a claim for defense witness immunity. Traditionally, the Sixth Amendment's Compulsory Process Clause gives the defendant the right to bring his witness to court and have the witness's non-privileged testimony heard, but does not carry with it the additional right to displace a proper claim of privilege, including the privilege against self-incrimination....

....

.... [Also], [w]ithout precluding the possibility of some circumstances not now anticipated, we simply do not find in the Due Process Clause a general requirement that defense witness immunity must be ordered whenever it seems fair to grant it. The essential fairness required by the Fifth Amendment guards the defendant against overreaching by the prosecutor.... It does not create general obligations for prosecutors or courts to obtain evidence protected by lawful privileges.

....

.... In fact, we think trial judges should summarily reject claims for defense witness immunity whenever the witness for whom immunity is sought is an actual or potential target of prosecution. No hearing should be held to establish such status. The prosecutor need only show that the witness has been indicted or present to the court *in camera* an *ex parte* affidavit setting forth the circumstances that support the prosecutor's suspicion of the witness's criminal activity. No duty is imposed upon the prosecutor; he simply has an option to rely upon the witness's status as an actual or potential target of prosecution to foreclose any inquiry concerning immunity for that witness.

boasting about his ability to launder Tindle's narcotics proceeds, were arguably relevant to Tindle's entrapment defense, evidence of that nature had already been placed before the jury by David Suskind.

A trial judge has broad discretion to choreograph a trial. In the instant case, it cannot be said that the district court abused its discretion in disallowing Feldman's taking the stand and needlessly presenting cumulative evidence.[6] Also, as an additional point even had it been error, it was nevertheless arguably harmless since the proffered testimony bore on an "entrapment defense"—a defense that strained belief when viewed against a backdrop of all the other evidence in the record.[7]

■ Tindle next claims that the district court admitted statements by co-conspirators, Herbert Suskind, Ronald Washington, Carl Kelly and Mary Tindle pursuant to Fed.R.Evid. 801(d)(2)(E) in violation of his sixth amendment right to confront the witnesses against him. Tindle asserts that the violation resulted from the fact that the government never proved the unavailability of the various declarants. *See Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (Supreme Court placed two restrictions on use of hearsay evidence in criminal trials: *prosecutor must establish that declarant is unavailable*[8] and statement may be admitted only if it bears adequate indicia of reliability[9]).

The prosecution sufficiently proved that the declarants were unavailable at trial. Suskind invoked his fifth amendment privilege while Washington indicated that he would invoke his privilege if called to testify. Kelly refused to testify after being called to the stand, indicating his desire to follow his attorney's advice. *See Holt v. Wyrick,* 649 F.2d 543, 548 (8th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982) (Witness rendered "unavailable" at trial after she exercised her fifth amendment privilege against self-

---

6. *See United States v. Heyward,* 729 F.2d 297, 301 n. 2 (4th Cir.1984), *cert. denied,* 469 U.S. 1105, 105 S.Ct. 776, 83 L.Ed.2d 772 (1985) ("The trial court has wide discretion [in ruling on admissibility pursuant to 403] and its determination will not be overturned except under the most 'extraordinary' of circumstances."); *United States v. Juarez,* 561 F.2d 65, 71 (7th Cir.1977) ("[T]rial judges are much closer to the pulse of a trial than [the appellate judges] can ever be and [thus] 'broad discretion' is necessarily accorded them in [ruling on admissibility pursuant to Rule 403].").

7. *See United States v. Michaels,* 726 F.2d 1307, 1315 (8th Cir.1984), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984) ("A district court's determination respecting the admissibility of evidence under Rule 403 is paid great deference and its determination will not be reversed on appeal 'absent a clear *and prejudicial* abuse of discretion.'" (emphasis added)).

8. More recently, in *United States v. Inadi,* — U.S. ——, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Supreme Court restricted the requirement of unavailability established in *Roberts* to the facts of the *Roberts* case. *Roberts,* said the *Inadi* court, held that unavailability is required only when prior testimony is sought to be introduced. In *Inadi* the Court permitted the introduction of the out-of-court statements of co-conspirators though the declarants were available. Thus, even had the hearsay declarants in this case been available as witnesses, their statements could have been introduced under *Inadi* without infringing on defendant's Sixth Amendment rights.

9. The Supreme Court in *Ohio v. Roberts* further ruled that "reliability [could] be inferred without more in a case where the evidence [fell] within a firmly rooted hearsay exception." *Ohio v. Roberts, supra,* 448 U.S. at 66, 100 S.Ct. at 2539. In *United States v. Siripan,* 771 F.2d 840, 845–46 (4th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 863, 88 L.Ed.2d 901 (1986), the court ruled that the co-conspirator exception to the hearsay rule, contained in Fed.R.Evid. 801(d)(2)(E), constituted a "firmly rooted hearsay exception" so that reliability need not be independently established. *United States v. Siripan* harmonizes with the position of the First, Fifth, and Seventh Circuits, *i.e.,* that statements admitted pursuant to Fed.R.Evid. 801(d)(2)(E) are presumptively reliable and therefore do not offend the confrontation clause. *Ottomano v. United States,* 468 F.2d 269, 273 (1st Cir.1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973); *United States v. Peacock,* 654 F.2d 339, 349–50 (5th Cir.1981), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983); *United States v. Xheka,* 704 F.2d 974, 987 n. 7 (7th Cir.1983), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. Papia,* 560 F.2d 827, 836 n. 3 (7th Cir.1977).

incrimination and refused to testify); *cf. United States v. Elmore,* 423 F.2d 775, 778 (4th Cir.1970), *cert. denied,* 400 U.S. 825, 91 S.Ct. 49, 27 L.Ed.2d 54 (1970). Mary Tindle, it seems safe to say, would have invoked her spousal privilege and would have thus rendered herself "unavailable" for trial. In fact, the appellant proved in his own case the unavailability of three of the four alleged co-conspirators; the fourth was his wife who arguably was more available to Tindle than to the government.

Thus, we conclude that Tindle's sixth amendment argument based on the admission of co-conspirators' statements lacks merit.

■ Next, we consider Tindle's assertion that he was improperly limited in cross-examining John Shelton, a key government witness. Shelton entered a plea agreement with the government whereby the government agreed that it would "not prosecute Mr. Shelton for his heroin related activities in [the District of Columbia]" in return for Shelton's full cooperation in the prosecution of Tindle and others. During cross-examination of Shelton, the defense attempted to show that Shelton had, in fact, violated 21 U.S.C. § 848 (the continuing criminal enterprise statute) and was thus subject to a potential sentence of life without parole; facing such an "air-tight" sentence Tindle contended would insure that Shelton would go to all lengths to please the government and assist in the prosecution of Tindle. The district court, however, restricted defense counsel to questions about the *actual* charges lodged against Shelton and to items specifically mentioned in the government's plea letter. Tindle contends that the district court's ruling deprived him of his sixth amendment right to confront the witnesses against him.

During cross-examination of Shelton, the jury learned that he was a convicted felon who has had a longstanding career as a successful drug dealer. They also learned that through his plea agreement with the government, he had "exposure to up to 33 years of federal and state incarceration as a result of [his] guilty plea" to charges in Virginia. While it would not have been an abuse of discretion to allow questioning regarding possible § 848 violations, it was not an abuse of discretion to disallow such questioning. The nature of discretionary matters is that they normally may properly be decided either way. The jury already heard ample evidence about a life laced with crime, deceit, and drug use. They knew he already faced over thirty years in prison. The district judge was simply limiting potentially expansive, time-consuming cross-examination. *See* Fed.R.Evid. 611(a).[10]

Even were we to assume that the district judge did abuse his discretion with respect to the limitation placed on Shelton's cross-examination, such abuse, nevertheless, constituted harmless error. That is, a reasonable juror, having heard all of Shelton's testimony on cross-examination, inevitably viewed Shelton's direct testimony with some skepticism, even without hearing about a possible sentence of life without parole.

■ We turn to Tindle's penultimate allegation of error. Tindle was charged with distributing heroin on four separate dates: June 8, 1982 (Count VI), September 15, 1982 (Count IX), September 30, 1982 (Count X), and November 17, 1982 (Count XIII). Tindle did not request an entrapment instruction as to Count VI. With respect to Count IX, Tindle did request an entrapment instruction and received it. As to Counts X and XIII, the district court denied Tindle's request for such an instruction. Tindle claims that the district court's refusal to instruct the jury on entrapment as to Counts X and XIII constituted reversible error. We disagree.

---

10. **Rule 611. Mode and Order of Interrogation and Presentation**

   **(a) Control by court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment.

It is true that the government furnished opportunities, through the use of undercover agents and government informants, for Tindle to commit the narcotics offenses in question. However, in *Sorrells v. United States*, 287 U.S. 435, 441, 442, 53 S.Ct. 210, 212, 213, 77 L.Ed. 413 (1932), the Supreme Court acknowledged that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises." The Court, though, did stress that "[a] different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." In the instant case, there was overwhelming evidence that Tindle was not "an innocent person" induced to distribute heroin but rather was a person predisposed to commit the crimes charged. *See Crisp v. United States*, 262 F.2d 68, 69 (4th Cir. 1958) (district court justified in not submitting entrapment issue to jury as to one defendant given there was no evidence of "inducement," only "opportunity"). Tindle starkly failed to make a showing of "unreadiness on his part or of persuasion by the [government]." *United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir.1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971). Without such a showing of "overreaching inducive conduct on the part of the government" and lack of predisposition, the district court acted properly in refusing to instruct the jury on entrapment as to the two counts in the indictment. *Id.*

And, lastly, Tindle alleges that there was insufficient evidence to sustain his conviction on Count X (September 30, 1982 distribution) of the indictment. Suffice it to say, the jury heard ample testimony about Tindle's participation in the heroin transaction on the date in question. There were several telephone calls between Tindle and Shelton before September 30 in which Tindle indicated his willingness to sell a substantial quantity of heroin to an undercover buyer, using Shelton as an intermediary. Also, although Tindle did not actually distribute the heroin to Shelton—Tindle's associate, Greer, met with Shelton and physically distributed the package—there was an October 15, 1982 telephone call between Shelton and Tindle which demonstrated Tindle's knowledge that the "deal" had been consummated on September 30.

Despite the foregoing, in *Batson v. Kentucky*, —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court decided that systematic exclusion of one race from a jury is a denial of equal protection making it necessary for this case to be remanded so that the district court may decide whether there was any merit to Tindle's claim of systematic exclusion.

REMANDED.