**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harry V. MOHNEY, Defendant–**
**Appellant.**

**No. 90–1527.**

United States Court of Appeals,
Sixth Circuit.

Cause Argued July 18, 1991.

Decided Nov. 27, 1991.

Rehearing and Rehearing En Banc
Denied Jan. 28, 1992.

examine witnesses concerning the closing agreement and by quashing subpoenas of witnesses to testify regarding the agreement?

We agree with the district court's disposition of these matters and therefore affirm.

Richard Delonis, Asst. U.S. Atty., Joseph Allen, Asst. U.S. Atty. (argued and briefed), Office of U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Edith S. Thomas, Detroit, Mich. (argued and briefed), for defendant-appellant.

Before RYAN and BOGGS, Circuit Judges, and DOWD, District Judge.*

RYAN, Circuit Judge.

Defendant Harry Mohney appeals his conviction for filing false individual income tax returns, in violation of 26 U.S.C. § 7206(1), and aiding and assisting in filing false corporate tax returns, in violation of 26 U.S.C. § 7206(2). The following issues are before us on appeal:

1. Whether prosecutorial misconduct and judicial errors deprived Mohney of a fair trial and the right to present a defense;

2. Whether the district court erred in denying the motion to suppress evidence obtained through a search warrant;

3. Whether the district court abused its discretion in rulings regarding the summary witness testimony;

4. Whether the district court erred in denying the motion for judgment of acquittal based on the insufficiency of the evidence;

5. Whether the district court erred in refusing Mohney's motion to dismiss Counts IV–VI based on a closing agreement Mohney reached with the IRS; and

6. Whether the district court impermissibly restricted Mohney's right to present a defense by refusing to permit him to

## I.

In 1966, Harry Mohney began acquiring what are euphemistically known by some as "adult entertainment" businesses which he ran as a sole proprietorship. These businesses included theaters, bookstores, peep machines, and novelty and film distributors, all featuring sex-oriented "entertainment." He organized each aspect of the business as a separate corporation. Most of these businesses had offices in Durand, Michigan. Mohney formed Modern Bookkeeping Services ("MBS") to handle and centralize the bookkeeping and tax preparation aspects of his businesses. He hired Elizabeth Scribner as the manager of MBS.

In 1984, federal agents, investigating a pattern of arsons at adult theaters, executed a search warrant of MBS headquarters. During the search, agents seized $400,000 in currency and records indicating that Mohney had not declared income collected from International Amusement's ("IA") peep machines. The income was skimmed by the route drivers who, after collecting coins from the peep machines, paid the location managers a "split" prior to recording the coins as income in the corporation's books. Based on these records, the government obtained an indictment against Mohney and three MBS employees.

Count I charged Mohney, Scribner, Thomas Tompkins (MBS' accountant), and Lee Klein (an attorney retained by MBS) with conspiring to defraud the IRS, in violation of 18 U.S.C. § 371. The district court dismissed this charge prior to trial.

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of

723 F.Supp. 1197.[1] The remaining counts named only Mohney. Counts II–IV charged Mohney with filing false individual income tax returns for the calendar years 1981–83, respectively, in violation of 26 U.S.C. § 7206(1). Counts V–VII charged that Mohney willfully aided and assisted in the filing of false corporate tax returns for Otis Mohney, Inc. ("OMI"), later IA, for the fiscal years 1982–84, respectively, in violation of 26 U.S.C. § 7206(2).

At trial, the government called fifty-two witnesses over a nine-week period. Many of these witnesses were former MBS employees who testified, under a grant of immunity, that Mohney was not actively involved in preparing the tax returns. Route drivers, who paid the splits to the location managers, also testified under immunity.

Key witnesses for the government were Kenneth and Barbara Goodrich, both of whom were directly involved with keeping IA's books. Pursuant to an immunity grant, the Goodriches testified concerning a two percent bonus Kenneth received, based on the revenue of certain peep machines. The calculation of this bonus showed that the peep machines produced income that Mohney had not declared.

A number of witnesses, including both Mohney's ex-wife and his former girlfriend, Gail Parmentier, testified that Mohney used cash to pay for living expenses, travel, family support, and film production. Witnesses involved in the sex-oriented film business testified that it was standard procedure to pay expenses for such films in cash. Parmentier also testified about her illicit relationship with Mohney.

The government concluded its case by presenting two summary witnesses, IRS Revenue Agents Robert Bednarczyk and Kenneth Peterson. Bednarczyk summarized the evidence regarding the corporate tax returns and presented his estimate of IA's revenue understatement on the individual returns. Peterson summarized the evidence regarding the individual returns

and gave an estimate of the understatement. The district court denied a defense motion to sequester these witnesses to prevent Peterson from relying on Bednarczyk's testimony.

The government did not call MBS manager Scribner as a witness, although she had been listed on its witness list. The government also refused to grant her immunity. Mohney attempted to call her as a witness, but she filed an affidavit asserting that she would invoke her Fifth Amendment privilege if called. The government also did not call or grant immunity to accountant Tompkins or attorney Klein.

Mohney's defense focused on his claimed peripheral and infrequent involvement with the businesses. He alleges that he was prevented from effectively presenting his defense because Jack Mohney, who handled IA's revenues and splits, was deceased, and because the government refused to call the only witnesses with direct knowledge of the IA returns: Tompkins, Scribner, and Klein.

The jury found Mohney guilty on each charge. The district court sentenced him to concurrent three-year terms of imprisonment on Counts II–VI, imposed a four-year probation term on Count VII, and fined him a total of $255,000. The court also imposed a special condition of probation requiring Mohney to pay back taxes found to be due and owing by the IRS.

## II.

### A.

### Right to a Fair Trial

Mohney contends that prosecutorial misconduct, compounded by the district court's errors, denied him a fair trial. In evaluating this claim, we recall that "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S.

Ohio, sitting by designation.

**1.** The dismissal of this charge was reversed in *United States v. Mohney,* 949 F.2d 899 (6th Cir. 1991).

209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982).

## 1.

### Immunity

 Mohney alleges that the prosecutor's refusal to grant immunity to Tompkins, Scribner, and Klein, who best understood MBS' operations and were crucial to his defense, while granting immunity to 20 other witnesses, and after indicating that the three would receive immunity and testify, amounted to prosecutorial misconduct. Mohney also protests the district court's refusal to compel the prosecution to grant immunity. The government responds that it is not obligated to grant immunity to key defense witnesses and that it properly refused to grant immunity to witnesses who were putative defendants.

The grant of immunity by a prosecutor is governed by 18 U.S.C. § 6002 *et seq.* This statute gives the executive branch sole authority to grant "use immunity" to witnesses. 18 U.S.C. § 6003; *see also United States v. Hooks,* 848 F.2d 785, 798 (7th Cir.1988). In exercising this power, the statute gives the prosecutor considerable discretion to request immunity when "in his judgment" it is "necessary to the public interest." *Id.* The statute does not require the government to grant a defense witness immunity. *Id.* at 799.

Two theories have emerged under which defendants would be entitled to a grant of immunity for prospective defense witnesses. The first theory, rejected by most courts, allows immunity for defense witnesses when necessary for an effective defense. The second theory provides immunity to remedy prosecutorial misconduct.

Under the effective defense theory, immunity is available when it is properly sought in the district court, the witness is available to testify, the proffered testimony is both essential and clearly exculpatory, and no strong governmental interests countervail against an immunity grant. *Virgin Islands v. Smith,* 615 F.2d 964, 972 (3d Cir.1980). Although our circuit recognized the serious problems refusal to extend immunity may present for defendants wishing to introduce essential evidence not otherwise available, we have held that federal courts do not have the inherent power to immunize witnesses whose testimony is essential to an effective defense. *United States v. Pennell,* 737 F.2d 521, 526–27 (6th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). We rejected this theory because it would violate separation of powers to recognize an inherent judicial right to grant immunity when immunity is a legislative creation explicitly entrusted to the executive branch. *Id.* at 527. Compelled judicial use immunity could also impair the subsequent prosecution of the witness. *United States v. Thevis,* 665 F.2d 616, 640 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). If the government will be limited to prosecuting either the defendant or the immunized witness because it will not be able to prove that the immunized testimony would not taint the prosecution of the witness, the choice of which one to prosecute should rest with the government, not with the courts. *Id.; Pennell,* 737 F.2d at 528. The majority of other circuits have also rejected this theory. *United States v. Angiulo,* 897 F.2d 1169 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990); *United States v. Paris,* 827 F.2d 395 (9th Cir.1987); *United States v. Tindle,* 808 F.2d 319, 325 (4th Cir.1986), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989); *United States v. Sawyer,* 799 F.2d 1494, 1506 (11th Cir. 1986), *cert. denied sub nom., Leavitt v. United States,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987); *Thevis,* 665 F.2d 616; *United States v. Turkish,* 623 F.2d 769 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); *In re Daley,* 549 F.2d 469, 479 (7th Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 110, 54 L.Ed.2d 89 (1977); *United States v. Graham,* 548 F.2d 1302, 1315 (8th Cir.1977); *Earl v. United States,* 361 F.2d 531, 534–35 (D.C.Cir.1966), *cert. denied,* 388 U.S. 921, 87 S.Ct. 2121, 18 L.Ed.2d 1370 (1967).

Even if we accepted the effective defense theory, Mohney still could not prevail on the facts of this case. Immunity under this

theory is not available if a strong counter-vailing government interest exists, such as a legitimate interest in prosecuting the witness where no appropriate safeguards are available. *Smith,* 615 F.2d at 973. The government here indicted Tompkins, Scribner, and Klein, along with Mohney. Although the district court dismissed the charge in the indictment naming the three potential witnesses, the dismissal was subject to a motion to reconsider throughout trial and was reversed on appeal. Moreover, even if the appeal had failed, the prosecution could have pursued charges against Tompkins, Scribner, and Klein for conspiracy to file false returns. Thus, the prosecution had a legitimate interest in prosecuting the witnesses.

This circuit has yet to rule on the second theory for granting immunity, to remedy prosecutorial misconduct. *Pennell,* 737 F.2d at 526. The theory was briefly considered in a recent unpublished opinion but found inapplicable to the facts in the case. *United States v. Doss,* 924 F.2d 1059 (6th Cir.1991). Under this theory, due process requires an immunity grant where the prosecution abuses its discretion by intentionally attempting to distort the fact-finding process. *Angiulo,* 897 F.2d at 1191. Immunity under this theory should not be granted lightly. *Smith,* 615 F.2d at 968. The defendant must show " 'that the government's decisions were made with the deliberate intention of distorting the judicial fact finding process.' " *Id.* (quoting *United States v. Herman,* 589 F.2d 1191, 1204 (3d Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979)). Mohney contends that the government here deliberately withheld immunity in order to keep necessary exculpatory evidence from the jury. It is clear that the government kept out important and relevant testimony of how the returns were prepared, including Mohney's involvement. The prosecution, however, is only prevented from refusing to immunize a witness when the prosecution's "sole desire" is to keep exculpatory testimony from the jury. *Angiulo,* 897 F.2d at 1193. The prosecution may properly refuse to immunize a witness

where it does not wish to hinder future criminal prosecutions of the witnesses. *Id.*

 Mohney also argues that the government's selective grants of immunity to its own witnesses, while denying immunity to his witnesses, deprived him of a fair trial. Selective grants of immunity could violate due process where they produce " 'egregiously lopsided access to evidence.' " *Hooks,* 848 F.2d at 802–03 (quoting *United States v. Buljubasic,* 808 F.2d 1260, 1268 (7th Cir.), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987)); *see also United States v. De Palma,* 476 F.Supp. 775, 781 (S.D.N.Y.1979). A defendant, however, does not have a right to have his witnesses immunized simply because the prosecution relies on immunized witnesses to make its case. *See United States v. Chagra,* 669 F.2d 241, 259 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *see also Hooks,* 848 F.2d 785.

> [T]he balance between the government's interest in prosecuting accused felons and the accused's interest in presenting exculpatory and otherwise unobtainable evidence should not be inflexibly resolved by the fortuity that the government grants immunity to a particular witness in a particular case. If the government's prosecutorial interest outweighs a defendant's interest in presenting such evidence, ... then the government's interest also outweighs any abstract concern with symmetry.

*Chagra,* 669 F.2d at 259. The government had already indicted Tompkins, Scribner, and Klein and thus had a real and legitimate interest in prosecuting them. Although our circuit has not directly addressed the issue of selective immunity grants, we have noted problems with compelling the prosecution to grant immunity to potential defendants:

> [T]he government as a practical matter may encounter great difficulty in satisfying the "heavy burden" of proving that its evidence against the witness is neither directly nor indirectly traceable to the immunized testimony ... [T]he government in almost all such cases

would be constrained to curtail the cross-examination of the immunized witnesses in order to "narrow the scope of the testimony that the witness will later claim tainted his subsequent prosecution."

*Pennell*, 737 F.2d at 528 (quoting *Turkish*, 623 F.2d at 775). In light of these concerns, we do not believe that selective immunity grants violated due process on these facts.

Because Mohney failed to establish that he was entitled to a judicially compelled immunity grant, even if our circuit were to recognize such a judicial power, we hold that the district court properly refused to order the prosecution to grant immunity to Tompkins, Scribner, and Klein.

### 2.

#### Other Allegations of Unfairness

Mohney raises other allegations of prosecutorial misconduct and judicial errors depriving him of a fair trial. First, he protests the district court's refusal to give the missing witness instruction which he requested, although the court did give a missing witness instruction. Second, he objects on relevancy grounds to the prosecution's references to the nature of his business and his illicit relationship with a seventeen-year-old female, and to the testimony of his former partner, Burton Gorelick, regarding a skim of profits with Mohney from theaters and bookstores. We find these remaining allegations wholly without merit.

### B.

#### Motion to Suppress

Mohney argues that the district court erred in refusing to suppress evidence found during searches of MBS and OMI, IA's predecessor. The government conducted these searches under the authority of three warrants: two authorizing the search of MBS and one authorizing the search of Entertainment World, another Mohney business located in the same building as OMI. On appeal, Mohney argues that the evidence should have been suppressed because the government failed to show probable cause and because the warrants failed to state with sufficient particularity the items to be seized. We need not reach these issues, however, as Mohney does not have standing to challenge these searches.

The "rights assured by the Fourth Amendment are personal rights, [which] ... may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247 (1968), *quoted in Rakas v. Illinois*, 439 U.S. 128, 138, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978). In some circumstances, an officer of a corporation may be a "person aggrieved" by a corporate search and seizure and thus have standing to challenge the search. For example, in *Henzel v. United States*, 296 F.2d 650 (5th Cir.1961), the appellant could challenge the search because he was the organizer, sole shareholder, and president of the corporation, who prepared much of the material seized from his office, where he spent the greater part of every working day. Where the documents seized were normal corporate records not personally prepared by the defendant and not taken from his personal office, desk, or files, in a search that was not directed at him personally, the defendant cannot challenge a search as he would not have a reasonable expectation of privacy in such materials. *United States v. Britt*, 508 F.2d 1052, 1055 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 40, 46 L.Ed.2d 42 (1975). *See also Williams v. Kunze*, 806 F.2d 594 (5th Cir. 1986). Without a reasonable expectation of privacy in the seized materials, an officer may not challenge a search of the corporation:

When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were

obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity. *Lagow v. United States,* 159 F.2d 245, 246 (2d Cir.1946), *cert. denied,* 331 U.S. 858, 67 S.Ct. 1750, 91 L.Ed. 1865 (1947), *quoted in Britt,* 508 F.2d at 1055; *cf. United States v. Salvucci,* 448 U.S. 83, 91–93, 100 S.Ct. 2547, 2552–54, 65 L.Ed.2d 619 (1980). Mohney argues that he had a reasonable expectation of privacy because MBS' and OMI's offices were not open to the public. However, it is hard to see how Mohney could have a reasonable expectation of privacy in documents he claimed to be completely uninvolved in preparing and which were kept in offices he claimed to rarely visit. Nor were the searches targeted at "getting" Mohney; the searches were conducted as part of an arson investigation begun by Indiana officials. Mohney, then, did not have a reasonable expectation of privacy in the materials seized that would permit him to challenge the search warrants and thus the evidence seized during these searches was properly admitted.

## C.

### Summary Witnesses

The prosecution presented the testimony of two summary witnesses, IRS Agents Bednarczyk and Peterson. These witnesses attended the entire trial and reviewed the voluminous documents entered into evidence in order to calculate the amount of gross income and/or gross receipts underreported on IA's and Mohney's tax returns. Bednarczyk's testimony addressed the corporate returns and Peterson testified as to the income underreported on the individual returns. Both used summary schedules which were admitted into evidence.

Mohney raises several objections to the testimony of Bednarczyk and Peterson. First, he argues that the district court erred in denying his motion to sequester Peterson during Bednarczyk's testimony. Second, he submits that they should not have been allowed to use summary charts. Third, he contends that the summary witnesses should not have been given access to documents not provided to the defense and not submitted as evidence. Fourth, he contends that the trial court erred in allowing the summary witnesses to render opinions on the ultimate issue, whether funds were diverted.

### 1.

### Exclusion of Witnesses

Federal Rule of Evidence 615 provides, in relevant part, that:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of ... (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Mohney moved to sequester Peterson under this rule so that Peterson, in testifying regarding the individual returns, would not "parrot" Bednarczyk's calculations and testimony. Because Peterson's testimony was based on Bednarczyk's calculations, the court denied the sequestration request so that if cross-examination should bring out any facts not considered by Bednarczyk in making his calculations, Peterson would be present to ensure the accuracy and completeness of his own testimony.

 The decision to permit a witness to remain in the courtroom "is within the discretion of the trial judge and should not normally be disturbed on appeal." *Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 630 (6th Cir.), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). This court has recognized that

> the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves before the jury.

*Id.* at 629–30. Therefore, "where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel." *Id.* at 630. The prosecution explained that the calculations of the individual returns depended on the calculations of the corporate returns and thus it would be beneficial for Peterson to hear Bednarczyk's testimony. The court thus did not abuse its discretion in allowing Peterson to remain in the courtroom. However, even if the court had abused its discretion, Mohney failed to show that the asserted error " 'created sufficient prejudice to require reversal.' " *United States v. Bobo,* 586 F.2d 355, 366 (5th Cir.1978) (quoting *United States v. Warren,* 578 F.2d 1058, 1076 (5th Cir.1978) (*en banc*), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980)), *cert. denied sub nom., Rowan v. United States,* 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979).

Mohney contends that the court should have sequestered Peterson because this court's decision in *United States v. Pulley,* 922 F.2d 1283, 1285–86 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 42 (May 28, 1991), limits the government to designating only one agent-witness to represent it. *Pulley,* however, dealt with subsection (2) of Fed.R.Evid. 615 prohibiting the sequestration of "an officer or employee of a party which is not a natural person designated as its representative by its attorney." Fed.R.Evid. 615. Because this case involves subsection (3) and because the prosecution established that both witnesses were "essential to the presentation of [its] cause" under that subsection, *Pulley* does not control.

### 2.

### Flow Charts

▮ Agent Bednarczyk used a chart as a visual aid in explaining how profits were skimmed. In commenting on such charts, this circuit has noted that "[t]here is an established tradition, both within this cir-

cuit and in other circuits, that permits a summary of evidence to be put before the jury with proper limiting instructions." *United States v. Scales,* 594 F.2d 558, 563 (6th Cir.), *cert. denied,* 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). Such a limiting instruction should explain "that the chart is not itself evidence but is only an aid in evaluating the evidence." *Id.* at 564. The court here provided such an instruction. Before the chart was shown to the jury, the court cautioned that "this is generally known as a visual aid. It is not evidence at this point. It's a visual aid to verbal testimony." After the defense objected that the testimony based on the flow chart was improper as the jury would accept the facts shown in the chart as conclusively proven, the court once again reminded the jury that the chart served simply as the foundation for Bednarczyk's calculations. Finally, the district court instructed the jury:

> This witness has been qualified as an expert witness in the area of general accounting principals [sic] and knowledge of the Internal Revenue Code and the regulations under the Internal Revenue Code. He is not qualified of course to summarize testimony before you in this case. Therefore the diagram that you see before you is merely an explanation of his understanding of what the testimony has been with regard to the matters that are on that chart. It is not the subject of his expert testimony. It is the facts upon which his expert testimony is based.
>
> To the extent that those facts you find not be established in this case then you will determine whether or not and what effect if any the fact that something has not been established or something on that chart is inaccurate affects his expert opinion, whether it does or it does not is a matter for you.... I just want to indicate that that is not evidence in this case. It's merely before you as his understanding or the basis upon which he renders his opinion, his factual understanding of the flow.

Because the court instructed the jury very clearly that the flow charts were simply

used to establish the basis of the calculations, it did not abuse its discretion in allowing their use.

### 3.

### Witness Reliance on Documents Not Available to Defense

Mohney contends that the summary witnesses unfairly based their testimony on documents not available to the defense. He points to the testimony of Bednarczyk that he "had access to some backup information like the numerous other books and records of the corporation" and that he reviewed a grand jury transcript. He also notes Peterson's testimony that he read a special agent's report to which the defense did not have access. Mohney, however, through the government's disclosure of Jencks Act materials, 18 U.S.C. § 3500, had all of the grand jury transcripts. Moreover, expert witnesses may properly base their opinions on evidence not presented at trial. Fed.R.Evid. 703. However, both witnesses explicitly stated that they had not based their calculations or testimony on material not in evidence. As Mohney cites no authority for the proposition that experts cannot use materials which they were exposed to outside of court and because the experts did not base their calculations upon these materials, no error occurred.

### 4.

### Ultimate Issue Testimony

 Mohney argues that the summary witness testimony was improper "ultimate issue" testimony which invaded the province of the jury. Mohney objects to the following testimony of Bednarczyk:

Q. Mr. Bednarczyk, do you have an opinion as to whether or not currency picked up by route drivers was reported as part of the gross receipts?

. . . .

A. In my opinion the currency was not reported.

Peterson also testified that the currency did not reach the bank and thus was not reported. The court allowed this testimony to explain the basis for the witnesses' conclusions. Decisions regarding the admissibility of expert testimony are within the discretion of the trial court and ordinarily may be reversed only for abuse of discretion. *Hanson v. Parkside Surgery Center,* 872 F.2d 745, 750 (6th Cir.), *cert. denied sub nom., Hanson v. Arrowsmith,* 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

Under Fed.R.Evid. 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However,

[t]he abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.

Fed.R.Evid. 704, Advisory Committee's Notes. The summary witnesses' testimony did not deprive the jury of its function by telling it what result to reach. As this court explained in reference to the opinion of another IRS agent:

Appellant's argument that [the agent] usurped the function of the jury is also without merit. [The agent] did not give her opinion about whether appellant was guilty or not; she gave her opinion regarding whether tax was due and owing for the years in question in order to assist the jury in determining a fact in issue. There was no abuse of discretion. . . .

*United States v. DeClue,* 899 F.2d 1465, 1473 (6th Cir.1990). Moreover, even if an ultimate issue was involved, the district court did not abuse its discretion in finding that the testimony would be helpful to the jury in understanding the testimony of the expert witnesses because "an IRS expert's analysis of the transaction itself, which necessarily precedes his or her evaluation of the tax consequences, is ... admissible evidence." *United States v. Windfelder,*

790 F.2d 576, 581 (7th Cir.1986). In order for the jury to understand the calculations and thus determine whether they accepted the analysis of the two witnesses, they needed to understand the assumptions upon which the testimony and calculations were based.

## D.

### Motion for Judgment of Acquittal

After the guilty verdict, Mohney moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29 based on the insufficiency of the evidence. The district court denied the motion without explanation. On appeal, this court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

Mohney was charged under 26 U.S.C. § 7206(1) for filing false individual income tax returns and § 7206(2) for aiding and assisting in filing false corporate tax returns. Those sections state:

**(1) Declaration under penalties of perjury.**—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

**(2) Aid or assistance.**—Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document....

Mohney argues that because the government failed to prove willfulness and knowledge, he should not have been convicted under section 7206(2). He challenges his conviction for underreporting his individual income under section 7206(1) based on the government's failure to show that he received the money allegedly skimmed from IA.

Mohney alleges that the prosecution failed to show that he willfully filed false returns. Willfulness under section 7206 "requires proof of specific intent to do something that the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Loney,* 719 F.2d 1435, 1436 (9th Cir.1983). A taxpayer's signature on a return does not in itself prove his knowledge of the contents, but knowledge may be inferred from the signature along with the surrounding facts and circumstances, and the signature is *prima facie* evidence that the signer knows the contents of the return. *United States v. Harper,* 458 F.2d 891, 894 (7th Cir.1971), *cert. denied,* 406 U.S. 930, 92 S.Ct. 1772, 32 L.Ed.2d 132 (1972). Such surrounding facts and circumstances include the defendant's knowledge of the business' revenues, his active role in the operations, his hiring of the accounting firm, and his payment of the taxes. *Id.* at 895. The government here offered evidence that Mohney was aware of and involved in the tax preparation: for example, memoranda and correspondence regarding a donation of films to the National Sex Forum as a tax deduction in 1980 show that the idea originated with Mohney. Other memoranda between Mohney, Tompkins, and Klein also show Mohney's involvement in and awareness of the tax returns. Willfulness may also be shown through the government's evidence that Mohney knew about the skim and the falsity of the returns. Gorelick testified that they had an agreement during the relevant time period to skim profits from bookstores and theaters, and that they agreed not to report certain peep show revenues. Gorelick also testified that the skimming was done in order to pay less taxes. The government also showed proof that Mohney knew of the IA skim through memoranda written to Mohney's father and to his accountant asking that the currency from IA, kept at Jack

Mohney's home, be delivered to Scribner every Monday, Wednesday, and Friday. This currency was not recorded in the corporate books. Finally, the willful intent to evade taxes was also shown by the testimony of Gail Parmentier that Mohney paid all of his expenses in cash so that the government could not keep track of his spendings, and that he frequently expressed hatred towards the government and likened the payment of taxes to enslavement. From this evidence, a reasonable juror could conclude that Mohney willfully filed false returns.

Mohney submits that the government's evidence was also insufficient to show that he received skimmed funds. The government, however, offered evidence showing Mohney's possession and control of diverted funds. Richard Hardy, a former bookkeeper for MBS, testified that Jack Mohney gave him money kept at Jack Mohney's home to give to Harry Mohney. Mohney's memorandum directing that the money kept at his father's home be given to Scribner three times per week is also evidence that he received the funds. Gorelick's testimony about how he split the skimmed profits from the bookstores and theaters with Mohney also shows that Mohney received the money skimmed from the peep shows. A reasonable juror could thus conclude that Mohney received the skimmed profits.

### E.

### Motion to Dismiss Based on Closing Agreement

■ Mohney brought a motion to dismiss based on a closing agreement which he entered into with the government pursuant to 26 U.S.C. § 7121. The district court denied the motion to dismiss because section 7122, not section 7121, covers compromises regarding criminal prosecutions, and because there was no evidence on the face of the document indicating that the parties intended it to preclude criminal prosecutions.

26 U.S.C. § 7121(a) provides:

(a) **Authorization.**—The Secretary is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period.

If such an agreement is approved, it is final and conclusive, unless there is a showing of fraud or malfeasance. 26 U.S.C. § 7121(b).

26 U.S.C. § 7122(a) provides:

(a) **Authorization.**—The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense.

The closing agreement expressly stated that it was entered into pursuant to section 7121. The district court correctly concluded that such an agreement, particularly this agreement, does not cover criminal cases. Although section 7121 does not expressly state whether it covers criminal prosecutions, its failure to address a matter clearly stated in the following section may suggest it is not intended to cover criminal cases. Moreover, the language of section 7121(a) authorizing an agreement "with any person relating to the liability of such person ... in respect of any internal revenue tax for any taxable period," does not indicate that closing agreements cover criminal prosecutions and penalties. Finally, nothing in the present closing agreement indicates that the parties intended it to cover criminal liability. The facts and objectives stated in the agreement relate only to suits brought by Mohney to claim refunds for the tax years 1971–83. The agreement details the overpayments and deficiencies for the relevant years and obligates Mohney to dismiss his suit. It does not discuss criminal liability, penalties, or any obligation on the part of the government to cease its investigation. The district court, then, did not err in finding "it not credible that the IRS would have so intended [to cover criminal liability] without reducing that understanding to an explicit writing."

### F.
### Limitation of Cross–Examination Regarding Closing Agreement

Mohney alleges that the district court abused its discretion in refusing to permit cross-examination regarding the closing agreement and in granting a government motion to quash subpoenas of government witnesses with knowledge of the agreement. The government argues that the closing agreement was not relevant to any issue in this case. In reviewing these arguments, this court notes that the district court has broad discretion under Fed.R.Evid. 611 to limit the scope of cross-examination and that this court should only reverse for a clear abuse of discretion. *United States v. Mahar,* 801 F.2d 1477, 1495 (6th Cir.1986). A decision to quash a subpoena should not be disturbed unless " 'fundamental rights were affected by the court's ruling.' " *Id.* at 1497 (citation omitted).

The district court refused to allow cross-examination regarding the agreement and quashed the subpoenas because it found that the agreement was not relevant to the issues before it. Mohney, citing *Jonson v. United States,* 281 F.2d 884 (9th Cir.1960); *Rau v. United States,* 260 F. 131 (2d Cir. 1919); and *Willingham v. United States,* 208 F. 137 (5th Cir.1913), argues that "a defendant in a tax prosecution is entitled to present any substantial evidence tending to support his defense that his criminal liability was the subject of a settlement agreement." The cases cited by Mohney, however, deal with compromises under section 7122. Unlike section 7121, section 7122 specifically states that an agreement made under its requirements relieves a defendant of criminal liability. Thus, the ability of a defendant to show a compromise under section 7122 would be relevant to a criminal defense, whereas showing that civil liability was determined would not be relevant to showing whether the defendant willfully filed false returns. The district court, then, did not abuse its discretion in refusing to allow cross-examination regarding an issue Mohney failed to show was relevant, nor did the court prejudice Mohney's rights by quashing subpoenas regarding that issue.

### III.

For the reasons set forth, we AFFIRM Mohney's conviction.